[Cite as *Childs v. Kroger*, 2023-Ohio-2034.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Tawan Childs, | : | |
| Plaintiff-Appellant, | : | No. 22AP-524 |
| | | (C.P.C. No. 19CV-10192) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| The Kroger Co. et al., | : | |
| Defendants-Appellees. | : | |

D E C I S I O N

Rendered on June 20, 2023

**On brief:** *Tawan Childs*, pro se. **Argued:** *Tawan Childs*.

**On brief:** *Littler Mendelson*, *P.C.*, *Jeffrey S. Hiller*, and *Judson S. Millhon*, for appellee. **Argued:** *Jeffrey S. Hiller*.

APPEAL from the Franklin County Court of Common Pleas

EDELSTEIN, J.

{¶ 1} Plaintiff-appellant, Tawan Childs, appeals from a judgment of the Franklin County Court of Common Pleas granting defendants-appellees, The Kroger Co. ("Kroger"), Heather Gray, Patti Hutchinson, and Levi VanReeth (collectively "appellees"), summary judgment on Mr. Childs' claims of race discrimination, disability discrimination, retaliation, wrongful termination in violation of public policy, unlawful aiding and abetting of discrimination, and defamation. For the reasons that follow, we affirm.

## I. Facts and Procedural History

{¶ 2} In 1994, when Mr. Childs was 17 years old, he fatally shot a man in Akron, Ohio. The juvenile court relinquished jurisdiction and transferred the case to the Summit County Court of Common Pleas. In 1996, Mr. Childs was tried as an adult and convicted of murder with a firearm specification. *See State v. Childs*, 9th Dist. No. 17653, 1996 Ohio

App. LEXIS 3975 (Sept. 18, 1996). The Summit County Court of Common Pleas sentenced Mr. Childs to a term of imprisonment and Mr. Childs was released from prison in 2013.

{¶ 3} In October of 2014, Mr. Childs submitted an employment application to Kroger at Kroger store #350 in Dublin, Ohio ("Dublin store"). (Apr. 16, 2021 Childs Dep., Ex. 1; Gray Aff. at ¶ 3.) Under the section of the application titled "Employment History," Mr. Childs stated he was currently employed by Embassy Suites as a lobby/front desk runner, and he had previously been employed by Exel/Groupon in 2013 as a picker/packer, by Grafton Correctional Institution ("GCI"), from 2008 to 2013 as an administrative reclaimer and program aide, by GCI from 2001 to 2002 as a food service worker, and by Madison Correctional Institution ("MCI"), from 1996 to 1997 as a food service worker. (Childs Dep., Ex. 1.) Mr. Childs also provided Kroger his resume, which identified Exel/Groupon, GCI, and MCI as his previous employers. (Childs Dep., Ex. 3.)

{¶ 4} In response to a question on the employment application asking if he had been convicted of a crime, Mr. Childs affirmed that he had. He identified the date of conviction as January 8, 1996, the conviction state and city as Akron, Ohio, and the disposition of the offense as "conviction." (Childs Dep., Ex. 1.) In response to the question asking him to explain the conviction, Mr. Childs wrote: "Juvenile offender transferred to adult court." (Childs Dep., Ex. 1.)

{¶ 5} Christine Gerace, a non-management, hourly-paid store recruiter at the Dublin store, interviewed Mr. Childs after he submitted his application. (Apr. 16, 2021 Gray Aff. at ¶ 4.) Mr. Childs testified in his deposition that, during his interview with Ms. Gerace, he "told her murder and everything." (Childs Dep., at 71.) Mr. Childs stated that Ms. Gerace told him she would "fight for [him]" because she was an "advocate for people who got in trouble and turned their lives around." (Childs Dep. at 72.)

{¶ 6} Kroger used a third-party vendor to conduct a background check on Mr. Childs before hiring him. (Gray Aff. at ¶ 4.) The vendor "only processed criminal history within the past seven years in specified jurisdictions," and searched for criminal history within "the past 15 years" if "admitted criminal information was provided." (Gray Aff. at ¶ 5.) As such, the 2014 background check did not discover Mr. Childs' 1996 murder conviction and instead returned to Kroger marked "clear." (Gray Aff. at ¶ 5.)

**{¶ 7}**    Kroger hired Mr. Childs effective November 11, 2014 as a part-time clerk in the produce department at its Dublin store.  (Childs Dep., Ex. 1, 9.)  Mr. Childs voluntarily completed paperwork when he was hired identifying his ethnic background as Black or African American.  (Childs Dep., Ex. 1.)  As an hourly-paid clerk in one of Kroger's Columbus, Ohio stores, Mr. Childs was a member of the United Food and Commercial Workers ("UFCW"), Local 1059.

**{¶ 8}**    In November of 2015, Mr. Childs applied for Kroger's management training program.  (Gray Aff. at ¶ 6.)  In the application he submitted for the management program, Mr. Childs again affirmed that he had been convicted of a crime.  (Childs Dep., Ex. 13.)  In response to the question on the management application asking him to describe the conviction, Mr. Childs wrote: "Juvenile Offender/Summit Co.: will explain at interview." (Childs Dep., Ex. 13.)

**{¶ 9}**    Mr. Childs had an initial screening interview for the management position with human resources coordinator Deb Gail.  (Gray Aff. at ¶ 7; Childs Dep., Ex. 14.)  During the interview, Mr. Childs told Ms. Gail that one of his "proudest achievements" occurred when he was working as an administrative clerk in the library at GCI.  (Childs Dep. at 136.) Following his interview with Ms. Gail, Mr. Childs had a panel interview with Ms. Gail, district manager Jill Wilder, and recruiting and training manager Heather Gray.  (Gray Aff. at ¶ 2, 7.)  Ms. Gray did not ask Mr. Childs about his prior conviction because she generally did not "inquire about juvenile offenses during interviews."  (Gray Aff. at ¶ 6.)  Since Mr. Childs was a current Kroger employee when he applied for the management position, Kroger conducted only a limited background check on Mr. Childs which looked for adverse actions in the healthcare field.  (Gray Aff. at ¶ 8.)  The limited background check returned as "clear" and Kroger selected Mr. Childs for a position in its management training program.  (Gray Aff. at ¶ 9.)

**{¶ 10}**  In May of 2016, Mr. Childs began working as an assistant store manager at Kroger store #216 in Reynoldsburg, Ohio ("Reynoldsburg store").  (Apr. 16, 2021 VanReeth Aff. at ¶ 3.) As an assistant store manager, Mr. Childs was no longer a member of the UFCW Local 1059. Levi VanReeth was the store leader of the Reynoldsburg store and Mr. Childs' direct supervisor.  (VanReeth Aff. at ¶ 3.)  Mr. Childs oversaw the merchandising department at the Reynoldsburg store.  (Childs Dep. at 168.)

{¶ 11} On February 28, 2017, an individual stole meat from the Reynoldsburg store while Mr. Childs was working. Mr. Childs stated the suspect "pulled a knife on [him] and pointed it at [him]" during the incident. (Childs Dep. at 174.) Mr. Childs described the robbery as "traumatic" and stated he began having panic attacks after the robbery. (Childs Dep. at 174-76.) In March of 2017, Mr. Childs asked Mr. VanReeth to transfer him to a different store due to "the stress that [the robbery] caused [him]." (Childs Dep. at 140, 188.) Mr. Childs claimed Mr. VanReeth "ignored" his transfer request. (Childs Dep. at 140.)

{¶ 12} Mr. Childs' 2016 year-end performance review, completed by Mr. VanReeth on April 21, 2017, rated Mr. Childs' overall performance as "consistently delivers expectations low." (Childs Dep., Ex. 17.) Mr. VanReeth stated in the review that Mr. Childs needed "better planning sessions," to be "more organized," to "tackle one item at a time," and "to focus on being clear and concise in order to be effective." (Childs Dep., Ex. 17.)

{¶ 13} On June 2, 2017, Mr. VanReeth and district human resources manager Lauren Flury placed Mr. Childs on a 30-Day Action Plan ("Action Plan"). The Action Plan stated Mr. Childs had to "achieve/show considerable improvement" in the following areas over the next 30 days: process walks, time management, team building, and detailed store walks. (Childs Dep., Ex. 18.) On June 16, 2017, Mr. VanReeth and Ms. Flury held a follow-up meeting with Mr. Childs regarding the Action Plan. Mr. VanReeth noted at the meeting that Mr. Childs' performance "did not show any improvement over the first 2 weeks" of the Action Plan. (Childs Dep., Ex. 19.)

{¶ 14} Mr. Childs testified that during his discussions with Mr. VanReeth regarding the Action Plan, Mr. VanReeth said to him, "[W]hy do black people always use the race card?" (Childs Dep. at 140.) Mr. Childs described Mr. VanReeth as a "racist" who showed "favoritism for whites and discriminated and was harsh against blacks." (Childs Dep. at 144, 153.) Mr. Childs noted that Mr. VanReeth ignored comments from Kroger's black leadership but acted with "urgency" in responding to comments from white leadership, that Mr. VanReeth fired an African American clerk from the Reynoldsburg store "without writing him up or anything," and that Mr. VanReeth reversed Mr. Childs' decision to suspend a Caucasian store clerk following an incident with a customer. (Childs Dep. at 142-43.)

{¶ 15} On June 26, 2017, Mr. Childs sent an email to Kathy Wagenknecht in Kroger's human resources department. (Childs Dep., Ex. 16.) In the email, Mr. Childs stated that Mr. VanReeth constantly "tor[e him] down and attacked [him] professionally." (Childs Dep., Ex. 16.) Mr. Childs asked Ms. Wagenknecht to take him off the Action Plan and transfer him to another store because Mr. VanReeth caused him "too much anxiety and stress." (Childs Dep., Ex. 16.)

{¶ 16} On July 3, 2017, Mr. Childs sent a letter to Ms. Wagenknecht to follow up on his June 26, 2017 email. (Childs Dep., Ex. 22.) Mr. Childs informed Ms. Wagenknecht that his primary care physician had diagnosed him with depression and that he was "request[ing] consideration and accommodation" as a result. (Childs Dep., Ex. 22.) Mr. Childs attached a July 3, 2017 note from his primary care physician, Dr. Aaron Friedberg, to the letter. In the note, Dr. Friedberg stated he had recently diagnosed Mr. Childs with depression, "which based on [their] discussion [was] related to stress in his workplace," and that he believed a "transfer of location would be beneficial for [Mr. Childs'] health." (Childs Dep., Ex. 22.)

{¶ 17} On July 21, 2017, Mr. Childs met with Ms. Flury and Kroger's talent and development manager Patti Hutchinson. (Apr. 16, 2021 Hutchinson Aff. at ¶ 4.) Mr. Childs stated that during the July 21, 2017 meeting the parties discussed "[a]ccomodation, transfer requests," and how Mr. VanReeth "was racially discriminatory against just black people." (Childs Dep. at 188-89.) Ms. Hutchinson, on the other hand, stated that Mr. Childs "did not report any discriminatory or retaliatory conduct to us nor any medical necessities" during the meeting, but indicated that "he wanted to be taken off his Action Plan and placed at a different store." (Hutchinson Aff. at ¶ 4.)

{¶ 18} On October 12, 2017, Mr. Childs sent a letter to Kroger's Columbus, Ohio division vice president of operation Bill Green. Mr. Childs informed Mr. Green that Mr. VanReeth "constantly harassed [him]" and that Mr. VanReeth appeared to have "a problem with black leadership" at Kroger. (Mot. to Deny Summ. Jgmt., Ex. 10.) In late October 2017, Kroger transferred Mr. VanReeth to another store in the Columbus, Ohio area. (Childs Dep. at 152; VanReeth Aff. at ¶ 8.)

{¶ 19} Effective February 11, 2018, Kroger transferred Mr. Childs to an assistant store manager position overseeing the human resources department at Kroger store # 802

in Sunbury, Ohio ("Sunbury store"). (Childs Dep., Ex. 25.) Leighanne Heitkamp was the store leader of the Sunbury store. (Childs Dep. at 195.) Ms. Heitkamp completed Mr. Childs' 2017 year-end performance review which rated Mr. Childs' overall performance as "consistently delivers expectations." (Apr. 21, 2021 Childs Aff. of Verity, Ex. 9.)

{¶ 20} On April 1, 2018, two clerks at the Sunbury store informed Mr. Childs that Donald Gladman, another clerk at the Sunbury store, had recently been convicted of importuning and became a registered sex offender. (Childs Dep. at 197, Ex. 26.) Mr. Childs stated that Mike Simoneski, another assistant store manager at the Sunbury store, told "[him] not to report [Mr. Gladman's conviction]" because it was "[Ms. Heitkamp's] store." (Childs Dep. at 198.) However, on April 1, 2018, Mr. Childs sent an email to Ms. Hutchinson and Ms. Heitkamp informing them of Mr. Gladman's conviction. (Childs Dep. Ex. 26.) Ms. Hutchinson thanked Mr. Childs and asked him to gather additional information. (Childs Dep., Ex. 26.)

{¶ 21} Kroger suspended Mr. Gladman's employment pending an investigation. (Hutchinson Aff. at ¶ 9.) The union grieved Mr. Gladman's suspension, and Mr. Childs participated in the grievance procedure. Mr. Childs recommended that Mr. Gladman be fired because he believed Mr. Gladman presented a safety risk to the minor employees at the Sunbury store. (Childs Dep. at 198-99, 203-05.) Mr. Gladman's employment was terminated following the union grievance process. (Hutchinson Aff. at ¶ 9.)

{¶ 22} In May of 2018, Mr. Childs informed some of his co-workers at the Sunbury store that he was involved in a motorcycle accident. (Childs Dep. at 107-08.; Hutchinson Aff. at ¶ 10.) An employee at the Sunbury store allegedly searched for information regarding the motorcycle accident and found an internet article regarding Mr. Childs' 1996 murder conviction. (Hutchinson Aff. at ¶ 10.) The store employee informed their supervisor, who informed Ms. Hutchinson, who informed Ms. Gray about Mr. Childs' murder conviction. (Hutchinson Aff. at ¶ 10; Gray Aff. at ¶ 10.)

{¶ 23} Ms. Gray explained that, because Kroger's criminal background matrices identified murder as a disqualifying conviction for either management or hourly-paid employment, she decided to terminate Mr. Childs' employment. (Gray Aff. at ¶ 11-12.) On May 29, 2018, Ms. Gray and Kroger's district asset protection assistant manager Steve

Shepard met with Mr. Childs to inform him that his employment with Kroger was terminated immediately.  (Gray Aff. at ¶ 12; Childs Dep., Ex. 28.)

**{¶ 24}** On December 20, 2019, Mr. Childs, through counsel, filed a complaint alleging claims of race discrimination, disability discrimination, retaliation, wrongful termination in violation of public policy, unlawful aiding and abetting of discrimination, and defamation.  Appellees took Mr. Childs' deposition on July 20, 2020.

**{¶ 25}** On August 6, 2020, Mr. Childs sent a pro se letter to the trial judge stating that appellees "improperly raised a stale disclosure issue" at his deposition. (Aug. 6, 2020 Letter at 1.)  Mr. Childs claimed that Kroger "evaded union rules," violated the applicable collective bargaining agreement, and violated the federal Labor-Management Reporting and Disclosure Act by terminating him because of his murder conviction.  (Aug. 6, 2020 Letter at 1.)  Relying on the August 6, 2020 letter, appellees attempted to remove the case to federal court.

**{¶ 26}** On November 30, 2020, the United States District Court for the Southern District of Ohio, Eastern Division adopted a report and recommendation from the court's chief magistrate judge and remanded the case back to the Franklin County Court of Common Pleas.  *Childs v. Kroger Co.*, S.D. Ohio No. 2:20-cv-4216, 2020 U.S. Dist. LEXIS 223537 (Nov. 30, 2020).  During the federal proceedings, the district court granted Mr. Childs' attorney's motion to withdraw.  *See Childs v. Kroger Co.*, S.D. Ohio No. 2:20-cv-4216, 2020 U.S. Dist. LEXIS 191604 (Oct. 15, 2020), fn. 1.  Mr. Childs proceeded pro se throughout the remainder of the action.

**{¶ 27}** On February 25, 2021, the trial court reactivated the case and issued an amended case schedule.  (Feb. 25, 2021 Am. Case Schedule.)  The amended case schedule set April 16, 2021 as the dispositive motion deadline and April 30, 2021 as the discovery cutoff date.  On April 14, 2021, Mr. Childs filed a motion asking the court to strike certain exhibits appellees introduced during his deposition.

**{¶ 28}** Appellees filed a Civ.R. 56 motion for summary judgment on April 16, 2021.  Appellees asserted Mr. Childs' claims of race and disability discrimination failed because he was not qualified for employment with Kroger due to his murder conviction.  Appellees argued Mr. Childs could not maintain his retaliation claim with respect to the Action Plan, because the Action Plan was not an adverse employment action and because Kroger placed

Mr. Childs on the Action Plan for the legitimate reason that his performance was substandard. Appellees also asserted that Mr. Childs' termination did not jeopardize the public policy expressed in R.C. 2950.034, and that Ms. Gray did not publish a false statement. Appellees supported their motion for summary judgment with affidavits from Ms. Gray, Mr. VanReeth, Ms. Hutchinson, and Mr. Shepard.

{¶ 29} On April 23, 2021, Mr. Childs filed a Civ.R. 37(A) motion to compel discovery and a motion to continue the dispositive motion deadline and discovery cutoff date. On May 3, 2021, Mr. Childs filed a motion to deny appellees' motion for summary judgment. Mr. Childs asserted that Kroger was estopped from relying on his murder conviction as the grounds for his termination and that the collective bargaining agreement between UFCW Local 1059 and Kroger applied to his termination. Mr. Childs claimed Mr. VanReeth discriminated against him on the basis of race through his "performance evaluation and illegitimate [Action Plan]," and that Kroger failed to accommodate his disability because it "took over 11 months for [Mr. Childs] to be transferred" to another store. (May 3, 2021 Mot. to Deny Summ. Jgmt. at 11, 15.) Mr. Childs argued appellees retaliated against him after he engaged in protected activity, that his termination violated the policy expressed in R.C. 2950.034 because "multiple minors worked at the Sunbury store," and that Ms. Gray defamed him by falsely telling Mr. Shepard that Mr. Childs did not disclose his murder conviction. (Mot. to Deny Summ. Jgmt. at 17, 19.) Mr. Childs supported his motion with his own affidavit and several exhibits.

{¶ 30} Thereafter, Mr. Childs filed a number of additional motions with the trial court. On May 20, 2021, Mr. Childs filed a Civ.R. 37(D) motion for sanctions. On August 30, 2021, Mr. Childs filed a motion in limine asking the court to exclude any "reference[] * * * to [his] background." (Aug. 30, 2021 Mot. in Lim. at 1.) On January 21, 2022, Mr. Childs filed a motion for leave and summary judgment. Mr. Childs also filed a motion for judicial notice on January 21, 2022.

{¶ 31} On March 21, 2022, the trial court issued a decision and entry denying Mr. Childs' motion for continuance and motion to compel discovery. On March 22, 2022, the trial court issued decisions and entries denying Mr. Childs' motion for leave and summary judgment and his motion for sanctions. On August 25, 2022, the trial court issued a decision and entry granting appellees' motion for summary judgment.

## II.     Assignments of Error

{¶ 32} Mr. Childs appeals, assigning the following errors for our review:

I. TRIAL COURT COMMITTED PLAIN AND REVERSIBLE ERROR TO THE HARM AND PREJUDICE OF APPELLANT ABUSING DISCRETION BY DENYING PLAINTIFF/APPELLANT'S MOTION TO COMPEL, MOTION FOR SANCTIONS WHEN DEFENDANTS INTENTIONALLY FAILED TO PRODUCE EVIDENCE AND INTENTIONALLY CONCEALED EVIDENCE VIOLATING OHIO RULES OF CIVIL PROCEDURE, DISCOVERY AND PROTECTION ORDER, AND DENYING PLAINTIFF'S MOTION TO STRIKE AND MOTION IN LIMINE VIOLATING OHIO RULES OF CIVIL PROCEDURE, RULE 12(F), 37 (A) AND (D), AND EVIDENCE RULE 402 AND 404.

II. TRIAL COURT COMMITTED REVERSIBLE ERROR TO THE HARM AND PREJUDICE OF APPELLANT AND ABUSED DISCRETION IN DENIAL OF LEAVE TO FILE SUMMARY JUDGMENT AND SUMMARY JUDGMENT MOTION AND MOTION FOR JUDICIAL NOTICE PURSUANT TO OHIO RULES OF CIVIL PROCEDURE, CIVIL RULE 56 (A) AND (C), AND OHIO RULES OF EVIDENCE 201, VIOLATING DUE COURSE, DUE PROCESS AND EQUAL PROTECTION UNDER LAW ART 1 § 16 OF OHIO CONST. AND 14TH AMENDMENT OF THE U.S. CONSTITUTION.

III. TRIAL COURT COMMITTED PLAIN AND REVERSIBLE ERROR TO THE HARM AND PREJUDICE OF APPELLANT, ABUSING DISCRETION AND VIOLATING DUE PROCESS WHEN DEFENDANTS RAISED DISCLOSURE, QUALIFICATIONS AND CRIMINAL BACKGROUND ISSUE 3 YEARS LATER WHICH HAD BEEN STALE, MOOT, AND WAIVED VIOLATING DUE PROCESS, EQUAL PROTECTION UNDER LAW, DUE COURSE NOTIFICATION REQUIREMENT, COLLATERAL ESTOPPEL, AND PLAINTIFF OBJECTED WITH EXPRESSED PROPERTY INTEREST IN UNION AGREEMENT, AND IMPLIED PROPERTY INTEREST SINCE PREEMPTION WAS INAPPLICABLE UNDER SUPREMACY CLAUSE. OHIO CONST ARTICLE 1 §16, U.S. 14th AMENDMENT.

IV. TRIAL COURT ABUSED DISCRETION AND COMMITTED REVERSIBLE ERROR TO THE HARM AND PREJUDICE OF APPELLANT BY GRANTING

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT SINCE DEFENDANTS WERE NOT ENTITLED BY LAW WHEN PLAINTIFF PRESENTED GENUINE ISSUE OF MATERIAL FACTUAL DISPUTES ON ALL CLAIMS VIOLATING OHIO RULES OF CIVIL PROCEDURE, CIVIL RULE 56 (A) AND (C).

(Sic passim.)

{¶ 33} Before considering Mr. Childs' assignments of error, we must address a procedural argument raised by appellees. Appellees contend this court lacks jurisdiction to address Mr. Childs' first, second, and third assignments of error because Mr. Childs failed to designate the judgments at issue in those assignments of error in his notice of appeal. (Appellees' Brief at 20.)

{¶ 34} Appellate courts have jurisdiction to review the final orders or judgments of the inferior courts in their district. Ohio Constitution, Article IV, Section 3(B)(2); R.C. 2505.03. An appeal as of right "shall be taken by filing a notice of appeal with the clerk of the trial court within the time allowed by [App.R.] 4." App.R. 3(A). App.R. 3(D) addresses the contents of the notice of appeal, and provides that a notice of appeal "shall designate the judgment, order or part thereof appealed from."

{¶ 35} Mr. Childs' notice of appeal designated only the trial court's August 25, 2022 decision and entry granting appellees' motion for summary judgment as the order appealed from. Appellees contend that Mr. Childs' failure to separately designate each interlocutory order in the notice of appeal deprives this court of jurisdiction to address the trial court's interlocutory orders. (Appellees' Brief at 18-20.) We disagree.

{¶ 36} This court has held that App.R. 3(D) "does not require an appellant to separately identify each interlocutory order issued prior to a final judgment." *533 Short North LLC v. Zwerin*, 10th Dist. No. 14AP-1016, 2015-Ohio-4040, ¶ 52, citing *Beatley v. Knisley*, 183 Ohio App.3d 356, 2009-Ohio-2229 (10th Dist.). Because a court's interlocutory orders merge with the court's final judgment, "an appeal from a final judgment includes all interlocutory orders merged with it." *Id.*, citing *Shaffer v. OhioHealth Corp.*, 10th Dist. No. 04AP-236, 2004-Ohio-6523, ¶ 12. *Accord Beatley* at ¶ 10 (stating that because the court's interlocutory order merged into the final judgment, "defendants did not need to name the [interlocutory order] in their notice of appeal"); *Accu-Check Instrument Serv. v. Sunbelt Business Advisors of Cent. Ohio*, 10th Dist. No. 09AP-

505, 2009-Ohio-6849, ¶ 23 (holding App.R. 3(D) "does not require an appellant to separately identify [in the notice of appeal] each interlocutory order issued prior to a final judgment"); *Shaffer* at ¶ 12; *Pla v. Cleveland State Univ.*, 10th Dist. No. 17AP-212, 2017-Ohio-8149, ¶ 12.

{¶ 37} Appellees rely on *C.V. Perry & Co. v. W. Jefferson*, 10th Dist. No. 93APE12-1640, 1994 Ohio App. LEXIS 4407 (Sept. 27, 1994), *In re England*, 10th Dist. No. 92AP-1749, 1993 Ohio App. LEXIS 2605 (May 18, 1993), and cases from our sister districts to support their contention that this court lacks jurisdiction to address the trial court's interlocutory orders. (Appellees' Brief at 18-19.) While *C.V. Perry & Co.* and *England* make statements indicating that an appellate court may refuse to consider an argument pertaining to an interlocutory order if the appellant failed to designate the order in their notice of appeal[1], these cases significantly predate the more recent precedent from this court noted above. As such, we follow the more "recent binding precedent of our court." *Pla* at ¶ 12, citing *533 Short North LLC*. While decisions from our sister districts may be persuasive and assistive, they are not binding authority on this court. *Estate of Aukland v. Broadview NH, LLC*, 10th Dist. No. 16AP-661, 2017-Ohio-5602, ¶ 21, quoting *Keytack v. Warren*, 11th Dist. No. 2005-T-0152, 2006-Ohio-5179, ¶ 51.

{¶ 38} Accordingly, because the trial court's interlocutory orders merged with the court's final judgment, this court has jurisdiction to address the trial court's interlocutory rulings. Therefore, we will address each of Mr. Childs' assignments of error. For ease of analysis, we address Mr. Childs' first and third assignments of error jointly.

## III. First & Third Assignments of Error–Motion to Compel, Motion for Sanctions, Motion to Strike, Motion in Limine & Mr. Childs' Criminal History

{¶ 39} Mr. Childs' first assignment of error asserts the trial court erred by denying his motion to compel, motion for sanctions, motion to strike, and motion in limine. Mr. Childs' third assignment of error asserts the trial court erred by permitting appellees to rely on his murder conviction as the grounds for his termination.

---

[1] *See C.V. Perry & Co.* (stating the appellate court was "unable to reach the merits of [an] assignment of error since plaintiffs ha[d] not filed a notice of appeal from this judgment as required by App.R. 3(D)"); *England* (finding an assignment of error was "not properly before this court," because the judgment designated in the notice of appeal did not contain the ruling the appellant sought to challenge).

**A. Motion to Compel**

{¶ 40} In his motion to compel, filed on April 23, 2021, Mr. Childs asked the trial court to direct appellees to turn over copies of a number of documents. The trial court denied Mr. Childs' motion to compel because Mr. Childs failed to demonstrate he made a good faith effort to resolve the discovery dispute without court intervention, and because Mr. Childs failed to explain how appellees' discovery responses were deficient. (Mar. 21, 2022 Decision and Entry at 1.) A trial court has broad discretion to regulate discovery, and an appellate court will not reverse a trial court's decision to grant or deny a motion to compel discovery absent an abuse of discretion. *Anderson v. Bright Horizons Children's Ctrs., LLC*, 10th Dist. No. 20AP-291, 2022-Ohio-1031, ¶ 99, citing *Ettayem v. Land of Arrat Invest. Group, Inc.*, 10th Dist. No. 19AP-427, 2020-Ohio-3006, ¶ 20. An abuse of discretion implies that the court's attitude is unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). *See Huffman v. Hair Surgeon, Inc.*, 19 Ohio St.3d 83, 87 (1985).

{¶ 41} On February 24, 2021, Mr. Childs served a discovery request on appellees requesting copies of various employment records pertaining to Mr. VanReeth, Ms. Flury, and other specified clerks from the Reynoldsburg store. (Apr. 23, 2021 Mot. to Compel Exs. 1 & 2.) On March 22, 2021, appellees responded to the discovery request and stated that they would produce additional documents when the trial court approved the parties' protective order. Appellees objected to Mr. Childs' requests for production of documents, asserting that the requested documents were irrelevant, that Mr. Childs' requests mischaracterized facts, and/or that appellees did not have documents responsive to the requests. (May 5, 2021 Resp. in Opp. to Mot. to Compel at 5.) However, appellees produced some information relevant to the listed employees, including the former employees' termination dates and termination codes. (Resp. in Opp. to Mot. to Compel at 5-6.)

{¶ 42} Parties may generally obtain discovery regarding any nonprivileged matter that is relevant to the party's claim or defense and proportional to the needs of the case. Civ.R. 26(B)(1). Parties may obtain discovery by various methods, including by production of documents. Civ.R. 26(A). When a party requests production of documents pursuant to Civ.R. 34, the responding party may object to the request and state the reasons for the objection. Civ.R. 34(B)(1). The requesting party "may move for an order under Civ.R. 37

with respect to any objection to or other failure to respond to the request" for production of documents. Civ.R. 34(B)(1).

{¶ 43} Civ.R. 37 governs motions to compel discovery, and provides that a motion to compel "shall include a certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make discovery in an effort to obtain it without court action." Civ.R. 37(A)(1). The Local Rules of Practice of the Franklin County Common Pleas Court, General Division ("Loc.R."), provide that "[c]ounsel and unrepresented parties shall make every effort to resolve discovery disputes by agreement prior to filing motions with the Court." Loc.R. 26.01. Accordingly, "a trial court does not err in denying a motion to compel when the moving party has failed to comply with the [Civ.R. 37(A)(1)] requirement[]" that they make a good faith effort to resolve the discovery dispute without court action. *Deutsche Bank Natl. Trust Co. v. Doucet*, 10th Dist. No. 07AP-453, 2008-Ohio-589, ¶ 20. *See also Jackson v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 20AP-233, 2021-Ohio-1642, ¶ 18 (denying motion to compel, in part, because the "appellant failed to confer with appellee before filing a motion to compel in contravention of Civ.R. 37(A)(1)"); *PennyMac Loan Servs., LLC v. Marker*, 7th Dist. No. 18 JE 0024, 2019-Ohio-4088, ¶ 35; *Buckner v. Washington Mut. Bank*, 12th Dist. No. CA2014-01-012, 2014-Ohio-5189, ¶ 25; *Falkenberg v. Kucharczyk*, 8th Dist. No. 111014, 2022-Ohio-2361, ¶ 32.

{¶ 44} In his motion to compel, Mr. Childs alleged that he made "a good faith attempt" to confer with appellees' counsel but that counsel was "unresponsive and evasive." (Mot. to Compel at 2.) Mr. Childs supported his motion to compel with emails he sent to appellees' counsel on March 25, 2021 and April 5, 2021. In the March 25, 2021 email, Mr. Childs approved appellees' proposed protective order and cautioned appellees "not to withhold evidence or destroy evidence." (Mot. to Compel, Ex. 3.) The trial court approved the parties' proposed protective order on April 5, 2021. In his April 5, 2021 email, Mr. Childs asked appellees if they could mail him a copy of his July 20, 2020 deposition. (Mot. to Compel Ex. 4.) However, in neither the March 25, 2021 nor April 5, 2021 email did Mr. Childs inform appellees that he believed their discovery responses were deficient or otherwise suggest that the parties needed to resolve a dispute regarding discovery.

{¶ 45} Accordingly, Mr. Childs failed to demonstrate that he made a good faith effort to resolve the discovery dispute without court action. As such, the trial court did not abuse its discretion by denying Mr. Childs' motion to compel discovery. *Deutsche Bank Natl. Trust Co.* at ¶ 20.

### B. Motion for Sanctions

{¶ 46} In his May 20, 2021 Civ.R. 37(D) motion for sanctions, Mr. Childs asserted appellees should be sanctioned for failing to satisfy discovery requests by "Intentional and Unlawful Interference with, Concealment and Misrepresentation of Evidence and []or lying and submitting false statements" to the trial court. The trial court concluded that Mr. Childs' motion for discovery sanctions was untimely pursuant to Loc.R. 26.02. (Mar. 22, 2022 Decision and Entry at 1.) An appellate court reviews a trial court's ruling on a motion for discovery sanctions for an abuse of discretion. *Huntington Natl. Bank v. Zeune*, 10th Dist. No. 08AP-1020, 2009-Ohio-3482, ¶ 17, citing *Nakoff v. Fairview Gen. Hosp.*, 75 Ohio St.3d 254 (1996), syllabus.

{¶ 47} Loc.R. 26.02 provides that the "discovery cutoff date specified in the Case Schedule shall be the last date for any party to seek the involvement of the assigned judicial officer in the discovery process by way of motion seeking * * * sanctions, * * * absent extraordinary circumstances." The amended case schedule established April 30, 2021 as the discovery cutoff date. As such, Mr. Childs' May 20, 2021 motion for sanctions was filed past the discovery cutoff date, in violation of Loc.R. 26.02. Mr. Childs did not provide any reason to justify his untimely filing.

{¶ 48} Additionally, Mr. Childs asked the court to sanction appellees for their failure to produce the documents that were the subject of his motion to compel. "[B]efore a court may sanction a party under Civ.R. 37 for failing 'to obey an order to provide or permit discovery,' the court must have actually issued an order to provide or permit discovery." *Gulbrandsen v. Summit Acres, Inc.*, 4th Dist. No. 14CA26, 2016-Ohio-1550, ¶ 35, quoting Civ.R. 37. *Accord Settle v. Thurber Manor Apts.*, 10th Dist. No. 98AP-608, 1999 Ohio App. LEXIS 2187, *10 (May 11, 1999), citing *Dafco, Inc. v. Reynolds*, 9 Ohio App.3d 4 (10th Dist.1983); *Rogers v. Credit Acceptance Corp.*, 9th Dist. No. 11CA010141, 2013-Ohio-1097, ¶ 10. When Mr. Childs filed his motion for sanctions, the trial court had not yet ruled on

Mr. Childs' motion to compel discovery, and the court ultimately denied the motion to compel.

{¶ 49} Accordingly, as Mr. Childs filed the motion for sanctions past the discovery cutoff date and the trial court never issued an order to compel discovery, the trial court did not abuse its discretion by denying Mr. Childs' motion for sanctions.

### C. Motion to Strike

{¶ 50} Mr. Childs' motion to strike asked the trial court to strike Exhibits 2 and 4 introduced during his deposition.[2] The trial court did not rule on the motion to strike before granting appellees' motion for summary judgment. "[A] trial court's failure to rule on a motion to strike before granting summary judgment to the moving party is deemed to be a denial of the earlier filed motion." *Hinton v. Ohio Bur. of Sentence Computation*, 10th Dist. No. 17AP-187, 2018-Ohio-237, ¶ 6. *See also Huntington Natl. Bank v. Bywood, Inc.*, 10th Dist. No. 12AP-994, 2013-Ohio-2780, ¶ 5 (stating that "[g]enerally, when a trial court enters judgment without expressly ruling on a pending motion, it is presumed that the court overruled the motion"). Accordingly, we presume the trial court denied Mr. Childs' motion to strike. An appellate court generally reviews a trial court's decision to grant or deny a motion to strike evidence for an abuse of discretion. *Nist v. Nexeo Solutions, LLC*, 10th Dist. No. 14AP-854, 2015-Ohio-3363, ¶ 14, citing *Pickens v. Kroger Co.*, 10th Dist. No. 14AP-215, 2014-Ohio-4825, ¶ 9.

{¶ 51} Mr. Childs' motion asked the court to strike the deposition exhibits pursuant to Civ.R. 12(F). Civ.R. 12(F) provides that, upon a timely motion, a court "may order stricken from any pleading any insufficient claim or defense or any redundant, immaterial, impertinent, or scandalous matter." Because the deposition exhibits were not pleadings under Civ.R. 7(A), Civ.R. 12(F) did not apply to Mr. Childs' request to strike the exhibits. *See Woodson v. Carlson*, 9th Dist. No. 21482, 2003-Ohio-5906, ¶ 4 (holding that because

---

[2] Mr. Childs' motion to strike also asked the court to strike Exhibit 29 introduced during his deposition. (Mot. to Strike at 3.) However, Exhibit 29 has been completely redacted from the record before this court and all references to the exhibit have been redacted from Mr. Childs' deposition. (Childs Dep. at 224-26; Ex. 29.) As such, we confine our analysis to Exhibits 2 and 4. Additionally, in the motion to strike Mr. Childs asked the trial court to strike all references to his criminal background. We address this argument in our review of Mr. Childs' motion in limine and third assignment of error.

the document at issue was "not a pleading under Civ.R. 7(A)," Civ.R. 12(F) "[did] not apply").

{¶ 52} Exhibit 2 was an email from the principal of London High School, stating that Mr. Childs never attended London High School. (Childs Dep., Ex. 2.) In the October 2014 employment application, Mr. Childs stated that he graduated from Madison Branch High School in London, Ohio. (Childs Dep., Ex. 1.) When appellees' counsel introduced Exhibit 2 at the deposition, counsel stated that the email was "correspondence that [his] office had with Madison Branch High School." (Childs Dep. at 38.) Mr. Childs noted that there "seem[ed] to be a mistake," because Madison Branch High School was located "at Madison Correctional Institution" in London, Ohio, but counsel had contacted London High School, an unrelated school. (Childs Dep. at 38.)

{¶ 53} Exhibit 4 was an email from an administrative assistant at GCI, stating that Mr. Childs was never employed by GCI. (Childs Dep., Ex. 4.) When appellees introduced Exhibit 4 during the deposition, Mr. Childs stated that the email was "not true" because he was "paid for [his] job [at GCI], every job classification that [he] had." (Childs Dep. at 50.) Mr. Childs argued in his motion to strike that appellees introduced Exhibits 2 and 4 to create the "false impression that [he] lied." (Mot. to Strike at 5.)

{¶ 54} Mr. Childs did not object to either Exhibit 2 or 4 during his deposition. "Errors and irregularities occurring at the [deposition] * * * of any kind which might be obviated, removed, or cured if promptly presented, are waived unless reasonable objection thereto is made at the taking of the deposition." Civ.R. 32(D)(3)(b). "Pursuant to Civ.R. 32(D)(3)(b), a party must object at the time of the deposition or her right to object is waived." *Bernal v. Lindholm*, 133 Ohio App.3d 163, 183 (6th Dist.1999). *See Safkow v. Scheiben*, 7th Dist. No. 99 CO 79, 2001 Ohio App. LEXIS 2113, *7 (May 7, 2001) (holding that because appellants did not object "during the deposition of Dr. Glazer * * * to Def. exhibits 5 or 7 * * * [a]ppellants ha[d] waived any errors pertaining to the aforementioned evidence"); *Ireton v. JTD Realty Invs., LLC*, 12th Dist. No. CA2010-04-023, 2011-Ohio-670, ¶ 25-26. Thus, Mr. Childs waived any error pertaining to Exhibit 2 or 4 by failing to object to the exhibits during his deposition. Moreover, because the trial court did not rely on either Exhibit 2 or 4 in its decision granting appellees' motion for summary judgment, any failure to strike the exhibits would amount to harmless error. *See* Civ.R. 61; *Wallick*

*Properties Midwest, LLC v. Jama*, 10th Dist. No. 20AP-299, 2021-Ohio-2830, ¶ 20; *O'Brien v. Angley*, 63 Ohio St.2d 159, 164-65 (1980).

### D. Motion in Limine and Third Assignment of Error–Mr. Childs' Criminal History

{¶ 55} Although Mr. Childs' first assignment of error asserts the trial court erred by denying his motion in limine, Mr. Childs does not present an argument regarding the motion in limine in his brief. An appellant must "include in its brief * * * [a]n argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions." App.R. 16(A)(7). An appellate court may disregard an assignment of error presented for review if the party raising it "fails to argue the assignment separately in the brief, as required under App.R. 16(A)." App.R. 12(A)(2). *See State v. Brown*, 10th Dist. No. 16AP-753, 2017-Ohio-7134, ¶ 14.

{¶ 56} However, Mr. Childs' motion in limine and third assignment of error both concern Mr. Childs' argument that Kroger waived its ability to rely on his criminal background. Mr. Childs' motion in limine asked the court to exclude any reference to his criminal background, and Mr. Childs' third assignment of error asserts the trial court erred by allowing appellees to rely on his criminal background, based on his waiver argument. As such, in the interests of justice, we will address Mr. Childs' contention under his first assignment of error regarding his motion in limine and Mr. Childs' third assignment of error jointly.

{¶ 57} "A motion in limine is a request 'that the court limit or exclude use of evidence which the movant believes to be improper, and is made in advance of the actual presentation of the evidence to the trier of fact, usually prior to trial.' " *Gordon v. Ohio State Univ.*, 10th Dist. No. 10AP-1058, 2011-Ohio-5057, ¶ 82, quoting *State v. Winston*, 71 Ohio App.3d 154, 158 (2d Dist.1991). We review a trial court's ruling on a motion in limine for an abuse of discretion. *Id.* at ¶ 82, citing *State v. Yohey*, 3d Dist. No. 9-95-46, 1996 Ohio App. LEXIS 999 (Mar. 18, 1996). Although the trial court did not rule on Mr. Childs' motion in limine before granting appellees' motion for summary judgment, we presume the court overruled the motion. *Bywood*, 2013-Ohio-2780 at ¶ 5.

{¶ 58} Throughout the case, Mr. Childs argued that Kroger either waived its ability to rely on, or was prevented from relying on, his criminal background for the following reasons: (1) Kroger conducted background checks on Mr. Childs and made promises to Mr. Childs regarding his employment; (2) because Mr. Childs allegedly disclosed his murder conviction when he was a union member, Kroger had to comply with the terms of the collective bargaining agreement before terminating his employment; and (3) because the federal magistrate found Kroger waived its ability to rely on Mr. Childs' criminal background, either the law of the case doctrine or collateral estoppel required the trial court to follow the federal magistrate's ruling. (Mot. in Lim.; Mot. to Deny Summ. Jgmt.; Mot. for Leave and Summ. Jgmt.; Appellant's Brief at 21-28.)

{¶ 59} When Mr. Childs became an assistant store manager in 2016, he became an at-will employee. "Ohio has long recognized the employment-at-will doctrine." *Lunsford v. Sterilite of Ohio, L.L.C.*, 162 Ohio St.3d. 231, 2020-Ohio-4193, ¶ 25, citing *La France Elec. Constr. Supply Co. v. Internatl. Bhd. of Elec. Workers, Local No. 8*, 108 Ohio St. 61 (1923), syllabus. Either party to an employment-at-will contract may "terminate the employment relationship for 'any reason which is not contrary to law.' " *Id.*, quoting *Mers v. Dispatch Printing Co.*, 19 Ohio St.3d 100, 103 (1985). *See Fendley v. Wright State Univ.*, 10th Dist. No. 18AP-113, 2019-Ohio-1963, ¶ 17 (stating "at-will employees face discharge for good reasons, bad reasons, or no reason at all," so long as the discharge is "not contrary to law"). The Supreme Court of Ohio has, however, recognized certain exceptions to the employment-at-will doctrine, including promissory estoppel and breach of an express or implied contract. *Lunsford* at ¶ 26; *Wright v. Honda of Am. Mfg., Inc.*, 73 Ohio St.3d 571, 574 (1995), citing *Mers* at 104-05.

{¶ 60} Mr. Childs testified that when he was initially hired, Kroger considered an applicant's criminal history "case by case, [considering] recency and severity and things like that." (Childs Dep. at 114.) Mr. Childs claimed that Kroger subsequently changed its policy to "contingency" whereby management had to "complet[e] a background check" before hiring an applicant. (Childs Dep. at 114-15.) In his motion in limine, Mr. Childs asserted that Mr. Gray and Ms. Gerace "both did independent Background Checks before and while Plaintiff was a union member" which resulted in the issue of his "background [being] waived." (Mot. in Lim. at 5.) In his motion to deny appellees' motion for summary

judgment, Mr. Childs asserted that equitable or promissory estoppel precluded Kroger from relying on his criminal background because he "relied on Kroger Co. waivers of background and criminal case on a case by case basis when [he was] first hired," and because he "quit his job at Embassy Suites for Career at Kroger Co. which Deb Gail asked him to do." (Mot. to Deny Summ. Jgmt. at 6.)

{¶ 61} "Promissory estoppel limits an employer's right to discharge an employee when promises have been made on which the employee relies to her detriment." *Montell v. Huntington Bancshares Inc.*, 10th Dist. No. 96APE12-1725, 1997 Ohio App. LEXIS 3634, *3 (Aug. 14, 1997). To establish the promissory estoppel exception to the employment-at-will doctrine, an employee must prove (1) a promise made by the employer that the employer reasonably should expect would induce action or forbearance on the part of its employee; (2) evidence that the expected action or forbearance actually resulted; and (3) such action or forbearance must have been detrimental to the employee. *Schrock v. A.R. Bldg. Co.*, 10th Dist. No. 20AP-567, 2021-Ohio-2831, ¶ 13, citing *Hester v. Case W. Res. Univ.*, 8th Dist. No. 104415, 2017-Ohio-103, ¶ 56. The promise must be clear and unambiguous in its terms, and must concern and limit the employer's right to discharge the employee. *Id.*; *Welch v. Finlay Fine Jewelry Corp.*, 10th Dist. No. 01AP-508, 2002 Ohio App. LEXIS 503 (Feb. 12, 2002). *See Wing v. Anchor Media, Ltd. of Texas*, 59 Ohio St.3d 108, 110 (1991) (noting that although the employee "may have thought that the promise of a future opportunity to buy into the station meant job security, such a promise is not a promise of continued employment and, therefore, [could not] reasonably be relied upon as such.").

{¶ 62} Mr. Childs did not present evidence of a clear and unequivocal promise from Kroger stating that it would not terminate Mr. Childs' employment because of his criminal history. Mr. Childs may have subjectively believed that, because Kroger conducted background checks on him and he disclosed his conviction to Ms. Gerace, Kroger would not subsequently rely on his murder conviction to terminate his employment. However, Mr. Childs' subjective belief was not a substitute for a specific promise of continued employment from Kroger. *See Welch* at *10 (finding the plaintiff's "subjective belief that if she obeyed her supervisors' order she would be ensured continued employment [could not] be a substitute for allegations of a specific promise of continued employment by the

employer"); *Schrock* at ¶ 15. Similarly, although Mr. Childs averred that Ms. Gail "asked [him] what would it take for [him] to leave Embassy Suites for management at Kroger," Ms. Gail's question did not amount to a promise of continued employment once Mr. Childs became a manager at Kroger. (Mot. to Deny Summ. Jgmt., Ex. 48 (Childs Aff.) at 2.) Accordingly, Mr. Childs failed to establish the promissory estoppel exception to the employment-at-will doctrine.[3]

**{¶ 63}** Mr. Childs' testimony and arguments demonstrate that he believed Kroger was aware of his murder conviction, either because of the background checks or Ms. Gerace, and that the murder conviction did not disqualify him from employment with Kroger when he was initially hired. Thus, Mr. Childs appears to contend that because his initial hire was appropriate, Kroger could not rely on a subsequent change in its policy to terminate his employment. However, when employment is at-will, an employer may "prospectively change the terms and conditions of the at-will employment contract, without consideration." *Carter v. Warner Interior*, 8th Dist. No. 71797, 1997 Ohio App. LEXIS 4894, *7 (Nov. 6, 1997), citing *Nichols v. Waterfield Fin. Corp.*, 62 Ohio App.3d 717, 719 (9th Dist.1989). Accordingly, Kroger could prospectively change which criminal convictions disqualified an individual from employment with Kroger and apply that change to any at-will employee. Ms. Gray's affidavit demonstrated that murder was a disqualifying conviction for both hourly-paid and management-level employment with Kroger.[4] (Gray Aff. at ¶ 11.) Mr. Childs did not present evidence to rebut Ms. Gray's averment that Kroger policy identified murder as a disqualifying conviction at least by the time of his termination in May of 2018.

**{¶ 64}** Mr. Childs further contends that Kroger breached the collective bargaining agreement between UFCW Local 1059 and Kroger, because Kroger did not comply with the disciplinary procedures of the agreement during his termination. (Appellant's Brief at 26.)

---

[3] Mr. Childs also asserted that equitable estoppel precluded Kroger from relying on his criminal background. " 'A prima facie case of equitable estoppel requires proof of (1) a factual representation that, (2) is misleading, (3) induces actual reliance that is reasonable and in good faith, and (4) causes detriment to the relying party.' " *Garb-Ko, Inc. v. Benderson*, 10th Dist. No. 12AP-430, 2013-Ohio-1249, ¶ 17, quoting *Hudson v. Petrosurance, Inc.*, 10th Dist. No. 08AP-1030, 2009-Ohio-4307, ¶ 38. Because Mr. Childs failed to identify a misleading factual representation made by Kroger which he relied on to his detriment, Mr. Childs failed to establish a prima facie case of equitable estoppel.

[4] Ms. Gray's affidavit does not indicate when Kroger's policy regarding murder convictions became effective.

Certainly, when an employee is a member of a labor union "the terms of her employment relationship [are] governed by a collective bargaining agreement." *Haynes v. Zoological Soc.*, 73 Ohio St.3d 254, 258 (1995). As such, a member of a labor union "is not an at-will employee." *Garrett v. City of Columbus*, 10th Dist. No. 11AP-1113, 2012-Ohio-3271, ¶ 15.

{¶ 65} However, from 2016 until his termination in 2018, Mr. Childs was an at-will, management level employee. The agreement between UFCW Local 1059 and Kroger stated that the union would be the sole and exclusive bargaining agent "for all employees * * * except Store Managers in the stores of the Employer within Local 1059's jurisdiction." (Mot. for Jud. Notice, Ex. 1 at 1.) *See also* 29 U.S.C. 152(3) (stating that, for purposes of the National Labor Relations Act, an "employee" does not include "any individual employed as a supervisor"). Because Mr. Childs was no longer a member of the union when he became an assistant store manager, the disciplinary procedures of the collective bargaining agreement did not apply to his termination in 2018. Mr. Childs presented no evidence to support his contention that the collective bargaining agreement could apply to his termination from his management level position simply because the grounds for his termination allegedly existed when he was a union member. As such, Mr. Childs failed to establish the breach of contract exception to the employment-at-will doctrine.

{¶ 66} In the federal removal proceeding, the district court's magistrate noted that, although Mr. Childs' August 6, 2020 letter referenced the Labor-Management Reporting and Disclosure Act, the language in the letter "suggest[ed] that [Mr. Childs] made these references for purposes of objecting to defense counsel's line of questioning at his deposition regarding his alleged failure to disclose his criminal record." *Childs*, 2020 U.S. Dist. LEXIS 191604 at *16. The magistrate further stated as follows:

> While not entirely clear, the [August 6, 2020 letter's] language also reflects that, to the extent Kroger could have pursed such an issue against him, Mr. Childs is contending that it should have done so when he was a union member subject to union due process protections. Mr. Childs asserts that Kroger's failure to do so resulted in a "waiver," making the issue "stale," "improper and moot" and, by extension, an inappropriate defense against him in this case.

*Id.*

{¶ 67} Mr. Childs appears to contend that the magistrate's statements amounted to a determination that Kroger had waived its ability to rely on his criminal record. However, the federal magistrate simply summarized the arguments contained in Mr. Childs' August 6, 2020 letter. The magistrate did not rule on those arguments. As such, Mr. Childs' contentions regarding the law of the case doctrine and collateral estoppel with respect to the magistrate's statements lack merit. *See Giancola v. Azem*, 153 Ohio St.3d 594, 2018-Ohio-1694, ¶ 1, citing *Nolan v. Nolan*, 11 Ohio St.3d 1, 3 (1984) (explaining that under the law of the case doctrine "legal questions resolved by a reviewing court in a prior appeal remain the law of that case for any subsequent proceedings at both the trial and appellate levels"); *Nye v. State Bd. of Examiners of Architects*, 165 Ohio App.3d 502, 2006-Ohio-948, ¶ 13, citing *State ex rel. Stacy v. Batavia Local School Dist. Bd. of Edn.*, 97 Ohio St.3d 269, 2002-Ohio-6322, ¶ 16 (stating that under the doctrine of collateral estoppel "an issue or a fact that was fairly, fully, and necessarily litigated and determined in a prior action, may not be drawn into question in a subsequent action between the same parties or their privies, whether the cause of action in the two actions be identical or different.").

{¶ 68} Thus, at the time of his termination in May of 2018, Mr. Childs was an at-will employee who could be discharged from his employment for any reason not contrary to law, without the protections afforded by the collective bargaining agreement between UFCW Local 1059 and Kroger. *Lunsford* at ¶ 25; *Mers* at 103. As such, the trial court did not err by permitting Kroger to rely on Mr. Childs' criminal history as the grounds for his termination. Based on the foregoing, we overrule Mr. Childs' first and third assignments of error.

## IV. Second Assignment of Error–Motion for Leave and Summary Judgment & Motion for Judicial Notice

{¶ 69} Mr. Childs' second assignment of error asserts the trial court erred by denying his motion for leave and summary judgment and his motion for judicial notice. The trial court denied Mr. Childs' motion for leave and summary judgment because the dispositive motion deadline expired nine months before Mr. Childs filed the motion, and because Mr. Childs did not establish good cause for his untimely filing.

{¶ 70} "Trial courts have inherent power to manage their own dockets and the progress of the proceedings before them." *Olentangy Condominium Assn. v. Lusk*, 10th

Dist. No. 09AP-568, 2010-Ohio-1023, ¶ 47, citing *State ex rel. Charvat v. Frye*, 114 Ohio St.3d 76, 2007-Ohio-2882, ¶ 23.  "Whether to grant or deny a motion to extend a court-ordered deadline * * * is a decision committed to the trial court's sound discretion." *Id.  See also* Civ.R.  6(B). Loc.R.  56.03 provides that a party may file a motion for summary judgment "no later than the dispositive motion deadline in the Case Schedule," and that "[l]eave of court is required for a filing after that deadline, which shall be granted only for good cause."

{¶ 71} The amended case schedule below established April 16, 2021 as the deadline for filing dispositive motions.  Mr. Childs filed his motion for leave and summary judgment on January 21, 2022, over nine months past the dispositive motion deadline.  Although Mr. Childs asked the trial court "for permission" to file his motion for summary judgment, Mr. Childs did not set forth any explanation for why he was unable to comply with the dispositive motion deadline.  (Mot. for Leave and Summ. Jgmt. at 1.)  Because Mr. Childs did not establish good cause for the delay, the trial court did not abuse its discretion by denying Mr. Childs' motion for leave and summary judgment.  *See Pilz v. Dept. of Rehab. & Corr.*, 10th Dist. No. 04AP-240, 2004-Ohio-4040, ¶ 6; *Lusk* at ¶ 48.

{¶ 72} Mr. Childs' motion for judicial notice asked the trial court to take judicial notice of the disciplinary procedures contained in the collective bargaining agreement between UFCW Local 1059 and Kroger.  The trial court did not rule on Mr. Childs' motion for judicial notice before granting appellees' motion for summary judgment.  As such, we presume the court overruled the motion.  *Bywood*, 2013-Ohio-2780 at ¶ 5.

{¶ 73} Evid.R. 201 permits a court to take judicial notice "of adjudicative facts; i.e., the facts of the case," and provides that a court "shall take judicial notice if requested by a party and supplied with the necessary information." Evid.R.  201(A), (D). A judicially noticed fact must be one "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Evid.R. 201(B).

{¶ 74} Because Mr. Childs was not a union member at the time of his termination, the disciplinary procedures of the collective bargaining agreement did not apply to his termination.  *See In re Mingle*, 5th Dist. No. 1999CA00075, 1999 Ohio App. LEXIS 5538,

*3 (Nov. 22, 1999) (noting that the "propriety of taking judicial notice * * * rests on whether the facts in the record are relevant and admissible to the case and whether it is proper to take judicial notice"). As such, Mr. Childs fails to establish how the court's failure to take judicial notice of the disciplinary procedures affected his substantial rights. Because the disciplinary procedures did not apply to the termination of his at-will employment, any error by the trial court with respect to the motion for judicial notice was harmless.[5] *See* Civ.R. 61; *In re R.B.*, 6th Dist. No. H-10-018, 2011-Ohio-5042, ¶ 15.

{¶ 75} Based on the foregoing, we overrule Mr. Childs' second assignment of error.

## V. Fourth Assignment of Error—Appellees' Motion for Summary Judgment

{¶ 76} Mr. Childs' fourth assignment of error asserts the trial court erred by granting appellees summary judgment on each of his claims. An appellate court reviews a grant of summary judgment under a de novo standard. *Capella III LLC v. Wilcox*, 190 Ohio App.3d 133, 2010-Ohio-4746, ¶ 16 (10th Dist.), citing *Andersen v. Highland House Co.*, 93 Ohio St.3d 547, 548 (2001). "[D]e novo appellate review means that the court of appeals independently reviews the record and affords no deference to the trial court's decision." (Internal quotations and citations omitted.) *Holt v. State*, 10th Dist. No. 10AP-214, 2010-Ohio-6529, ¶ 9. Summary judgment is appropriate only when the moving party demonstrates: (1) no genuine issue of material fact exists, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds could come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made. Civ.R. 56(C); *State ex rel. Grady v. State Emp. Relations Bd.*, 78 Ohio St.3d 181, 183 (1997). In ruling on a motion for summary judgment, the court must resolve all doubts and construe the evidence in favor of the non-moving party. *Premiere Radio Networks, Inc. v. Sandblast, L.P.*, 10th Dist. No. 18AP-736, 2019-Ohio-4015, ¶ 6, citing *Pilz*, 2004-Ohio-4040 at ¶ 8.

{¶ 77} Pursuant to Civ.R. 56(C), the moving party bears the initial burden of informing the trial court of the basis for the motion and of identifying those portions of the

---

[5] "Error is harmless if a court determines that 'if [the] error[] had not occurred, the jury or other trier of the facts would probably have made the same decision.' " *Shupe v. Media Distribs. LLC*, 10th Dist. No. 11AP-336, 2012-Ohio-325, ¶ 19, quoting *Hallworth v. Republic Steel Corp.*, 153 Ohio St. 349 (1950), paragraph three of the syllabus.

record demonstrating the absence of a genuine issue of material fact. *Dresher v. Burt*, 75 Ohio St.3d 280, 293 (1996). If the moving party fails to satisfy its initial burden, the court must deny the motion for summary judgment. *Id.* If the moving party satisfies its initial burden, summary judgment is appropriate unless the non-moving party responds, by affidavit or otherwise as provided under Civ.R. 56, with specific facts demonstrating a genuine issue exists for trial. *Id.*; *Hall v. Ohio State Univ. College of Humanities*, 10th Dist. No. 11AP-1068, 2012-Ohio-5036, ¶ 12, citing *Henkle v. Henkle*, 75 Ohio App.3d 732, 735 (12th Dist.1991).

### A. Race & Disability Discrimination

{¶ 78} The trial court concluded that Mr. Childs had not established a prima facie case of race or disability discrimination, and that appellees had asserted a legitimate and non-pretextual reason for Mr. Childs' termination—Mr. Childs' "criminal history, including a murder conviction, rendered him ineligible for employment with Kroger." (Decision at 4.)

{¶ 79} R.C. 4112.02(A) provides that it is an unlawful discriminatory practice "[f]or any employer, because of the race, color, religion, sex, military status, national origin, disability, age, or ancestry of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." Ohio courts often look to federal anti-discrimination case law when examining employment discrimination cases made under state law. *Nelson v. Univ. of Cincinnati*, 10th Dist. No. 16AP-224, 2017-Ohio-514, ¶ 31, citing *Coryell v. Bank One Trust Co. N.A.*, 101 Ohio St.3d 175, 2004-Ohio-723, ¶ 15. *See Williams v. Akron*, 107 Ohio St.3d 203, 2005-Ohio-6268, ¶ 31.

{¶ 80} To prevail in an employment discrimination case, a plaintiff must prove discriminatory intent through either direct or indirect methods of proof. *Ricker v. John Deere Ins. Co.*, 133 Ohio App.3d 759, 766 (10th Dist.1998), citing *Mauzy v. Kelly Servs., Inc.*, 75 Ohio St.3d 578, 583 (1996). Direct evidence of discriminatory intent consists of evidence "that can be interpreted as an acknowledgment of discriminatory intent," and only the most blatant remarks will constitute direct evidence of discrimination. *Dautartas v.*

*Abbott Laboratories*, 10th Dist. No. 11AP-706, 2012-Ohio-1709, ¶ 35, quoting *Southworth v. N. Trust Sec., Inc.*, 195 Ohio App.3d 357, 2011-Ohio-3467, ¶ 4 (8th Dist.).

{¶ 81} If a plaintiff lacks direct evidence of discriminatory intent, they may raise an inference of discriminatory intent indirectly through the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Mauzy* at 583. Under the *McDonnell Douglas* analysis, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. *McDonnell Douglas Corp.* at 802; *Plumbers & Steamfitters Joint Apprenticeship Commt. v. Ohio Civil Rights Comm.*, 66 Ohio St.2d 192, 197 (1981). To establish a prima facie case of discrimination, a plaintiff must demonstrate that they (1) are a member of a protected class, (2) suffered an adverse employment action, (3) were qualified for the position in question, and (4) were replaced by someone outside of the protected class or that the employer treated a similarly situated non-protected person more favorably. *McDonnell Douglas Corp.* at 802; *Veal v. Upreach LLC*, 10th Dist. No. 11AP-192, 2011-Ohio-5406, ¶ 21. Establishing a prima facie case "creates a presumption that the employer unlawfully discriminated against the employee." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981).

{¶ 82} If a plaintiff establishes a prima facie case, the burden shifts to the employer to articulate some legitimate, non-discriminatory reason for the challenged action. *Williams* at ¶ 12; *Bowditch v. Mettler Toledo Internatl., Inc.*, 10th Dist. No. 12AP-776, 2013-Ohio-4206, ¶ 16. The employer's burden at this stage "is one of production (not persuasion)." *Boyd v. Ohio Dept. of Mental Health*, 10th Dist. No. 10AP-906, 2011-Ohio-3596, ¶ 27, citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000). If the employer submits evidence that "*taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action," the employer has met its burden of production. (Emphasis sic.) *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993).

{¶ 83} If the employer meets its burden of production, "the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Burdine* at 253, citing *McDonnell Douglas Corp.* at 804. A plaintiff may establish that the reasons offered by the employer were a pretext for discrimination by demonstrating that the articulated reasons had no basis in fact, were not the actual reasons for the adverse

action, or were insufficient to explain the employer's action. *Hartman v. Ohio Dept. of Transp.*, 10th Dist. No. 16AP-222, 2016-Ohio-5208, ¶ 21, quoting *Smith v. Ohio Dept. of Pub. Safety*, 10th Dist. No. 12AP-1073, 2013-Ohio-4210, ¶ 77. *See St. Mary's* at 515. Although the burdens of production shift under the *McDonnell Douglas* analysis, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine* at 253.

### 1. Race Discrimination

{¶ 84} Mr. Childs satisfies the first element of his prima facie case for race discrimination because he is African American and therefore a member of a protected class. With respect to the second element, Mr. Childs unquestionably suffered an adverse employment action when Kroger terminated his employment.[6] However, Mr. Childs is unable to establish the third element of his prima facie case, because his murder conviction rendered him unqualified for employment at Kroger.

{¶ 85} "The test for determining whether an employee is otherwise qualified is whether 'he was doing his job well enough to meet his employer's legitimate expectations.' " *Strickland v. Fed. Express Corp.*, 45 Fed.Appx 421, 424 (6th Cir.2002), quoting *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1023 (6th Cir.2000). In her affidavit, Ms. Gray averred that

---

[6] Mr. Childs, however, asserts that Mr. VanReeth took adverse employment actions against him through the "[2016] performance evaluation and illegitimate [Action Plan]." (Appellant's Brief at 39.) For purposes of an employment discrimination claim, an adverse employment action consists of a "materially adverse change in the terms and conditions of the plaintiff's employment." *Canady v. Rekau & Rekau, Inc.*, 10th Dist. No. 09AP-32, 2009-Ohio-4974, ¶ 25, citing *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 593 (6th Cir.2007). Thus, an adverse employment action includes any " ' "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." ' " *Id.*, quoting *Tepper v. Potter*, 505 F.3d 508, 515 (6th Cir.2007), quoting *Burlington Industries, Inc., v. Ellerth*, 524 U.S. 742, 761 (1998). Employment actions that result in mere inconvenience or an alteration of job responsibilities are not disruptive enough to constitute adverse employment actions for purposes of a discrimination claim. *Id.*, citing *Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 182 (6th Cir.2004). Mr. Childs failed to establish that, as a result of the 2016 performance review or the Action Plan, he received less pay, was demoted, or that he received significantly diminished responsibilities. *See Mowery v. Columbus*, 10th Dist. No. 05AP-266, 2006-Ohio-1153, ¶ 24 (finding that a "negative performance appraisal" did not constitute an adverse employment action, because the employee "submitted no evidence that she received less pay, worse assignments, a less distinguished title or significantly diminished material responsibilities, or that appellees denied her promotions, pay increases or other benefits based on her appraisal"); *Haynes v. Level 3 Communications, LLC*, 456 F.3d 1215, 1224 (10th Cir.2006) (joining the other "circuits in holding a [performance improvement plan], standing alone, is not an adverse employment action" for purposes of a discrimination claim); *Creggett v. Jefferson Cty. Bd. of Edn.*, 491 Fed.Appx. 561, 566 (6th Cir.2012). Mr. Childs failed to establish that the performance review or Action Plan caused a materially adverse change in the terms and conditions of his employment.

"Kroger's criminal background matrices list a murder conviction as a disqualifying event for employment for both management and hourly-paid employees or applicants." (Gray Aff. at ¶ 11.) Ms. Gray further averred that Kroger routinely "denie[d] employment to applicants whose background check results reveal a disqualifying criminal conviction, and it has also terminated employees when, after an employee's initial hire, management discovers that they have been convicted of a disqualifying crime." (Gray Aff. at ¶ 11.)

{¶ 86} Mr. Childs presented no evidence to rebut Ms. Gray's affidavit. Even accepting Mr. Childs' contention that Kroger policy did not identify murder as a disqualifying conviction when he was hired, a plaintiff must demonstrate that they were qualified for their position "at the time of [their] termination." *Strickland* at 424. *See Webb v. ServiceMaster BSC LLC*, 438 Fed.Appx. 451, 453 (6th Cir.2011) (holding that an employee could not rely on "positive performance reviews from prior years to establish his qualifications at the time of termination," because the employee's "performance or [the employer's] expectations may have legitimately changed since the prior review period."). Ms. Gray's affidavit demonstrated that, at least by the time of Mr. Childs' termination in 2018, Kroger policy identified murder as a disqualifying conviction.

{¶ 87} Because Mr. Childs failed to establish that he was qualified for his assistant store manager position, Mr. Childs failed to establish a prima facie case of discrimination. As such, we need not consider the remaining steps of the *McDonnell Douglas* analysis. *See Moody v. Ohio Dept. of Mental Health & Addiction Servs.*, 10th Dist. No. 21AP-159, 2021-Ohio-4578, ¶ 33 (10th Dist.) (holding that "[b]ecause Moody failed to establish a prima facie case of race or national origin discrimination, we need not consider the second or third steps of the *McDonnell Douglas* analytical framework"); *Taylor v. Ohio Dept. of Job & Family Servs.*, 10th Dist. No. 11AP-385, 2011-Ohio-6060, ¶ 20 (stating that the "failure to establish any single element [of a prima facie case] is fatal to a discrimination claim"). [7]

---

[7] However, even if we were to consider the remaining steps of the analysis, Mr. Childs' race discrimination claim would fail. Mr. Childs contends that Kroger's reliance on his murder conviction as the grounds for his termination was a pretext for discrimination because (1) Ms. Gray "mention[ed] at the termination meeting, 'Black thug or Black professional,' " (2) Kroger performed background checks before hiring him, and (3) he disclosed his murder conviction to Ms. Gerace. (Appellant's Brief at 41.) Regarding the comment Mr. Childs now attributes to Ms. Gray, at his deposition Mr. Childs testified that during the May 29, 2018 termination meeting "[he] was like, what is it, black thug or black profession." (Childs Dep. at 155.) In his affidavit, Mr. Childs stated that during the termination meeting Ms. Gray "call[ed him] a thug and asked * * *, in a whisper loud enough for me to hear, 'Is it black professional or black thug.' " (Childs Aff. at 8.) Because Mr. Childs provided no explanation for the contradiction between his deposition testimony and his affidavit regarding

Therefore, the trial court did not err by granting appellees summary judgment on Mr. Childs' claim for race discrimination.

## 2. Disability Discrimination

**{¶ 88}** Mr. Childs asserts that appellees discriminated against him by failing to transfer him to another store to accommodate his disability. The trial court noted that, although Mr. Childs argued he "was diagnosed with depression, anxiety, and/or PTSD,"[8] Mr. Childs admitted that "his physical and mental conditions did not prevent him from working." (Decision at 4.) As such, the trial court concluded that Mr. Childs was not disabled.

**{¶ 89}** Generally, to recover on a claim for disability discrimination under R.C. 4112.02(A), a plaintiff must demonstrate that: (1) he or she was disabled; (2) the employer took an adverse employment action against the plaintiff, at least in part, because the plaintiff was disabled; and (3) the plaintiff, though disabled, can safely and substantially perform the essential functions of the job in question. *Columbus Civ. Serv. Comm. v. McGlone*, 82 Ohio St.3d 569, 571 (1998), citing *Hazlett v. Martin Chevrolet, Inc.*, 25 Ohio St.3d 279, 281 (1986).

**{¶ 90}** Disability discrimination can include "both an employer's taking an adverse employment action based on an employee's disability and an employer's failure to make a reasonable accommodation." *Shaver v. Wolske & Blue*, 138 Ohio App.3d 653, 663 (10th Dist.2000), citing *Taylor v. Phoenixville School Dist.*, 184 F.3d 296, 306 (3d Cir.1999). "An employer must make reasonable accommodation(s) to the disability of an employee or

who made the comment, Mr. Childs' affidavit could not create a genuine issue of material fact which would preclude summary judgment. *Byrd v. Smith*, 110 Ohio St.3d 24, 2006-Ohio-3455, paragraph three of the syllabus (holding that an affidavit of a party opposing summary judgment that "contradicts former deposition testimony of that party may not, without sufficient explanation, create a genuine issue of material fact to defeat the motion for summary judgment"); *Allen v. Dept. of Adm. Servs. Office of Risk Mgt.*, 10th Dist. No. 19AP-729, 2020-Ohio-1138, ¶ 25-26. Ms. Gray's affidavit demonstrates that the background checks did not reveal Mr. Childs' murder conviction, and Mr. Childs never produced evidence demonstrating that Ms. Gerace informed anyone else at Kroger about his murder conviction. (Gray Aff. at ¶ 5-9.) Accordingly, even viewing the summary judgment evidence in a light most favorable to Mr. Childs, Mr. Childs failed to present evidence indicating that Kroger's stated reason for his termination, *i.e.* his disqualifying murder conviction, had no basis in fact, was not the actual reason for the termination, or was insufficient to explain Kroger's decision to terminate his employment. *Hartman* at ¶ 21.

[8] Although Mr. Childs presented evidence demonstrating that he was diagnosed with anxiety and PTSD after his employment with Kroger ended, during his employment with Kroger Mr. Childs was only diagnosed with depression. (Mr. Childs' Aff. of Verity Exs. B & C; Childs Dep. at 101-03.) As such, we focus our analysis of Mr. Childs' disability discrimination claim on his diagnosis of depression.

applicant, unless the employer can demonstrate that such an accommodation(s) would impose an undue hardship on the conduct of the employer's business." Ohio Adm.Code 4112-5-08(E)(1). To establish a prima facie case of failure to accommodate, the plaintiff must show that: (1) they are disabled; (2) they are otherwise qualified for the position (with or without reasonable accommodation); (3) their employer knew or had reason to know about her disability; (4) they requested an accommodation; and (5) the employer failed to provide the necessary accommodation. *Coomer v. Opportunities for Ohioans with Disabilities*, 10th Dist. No. 21AP-158, 2022-Ohio-387, ¶ 17, citing *DiCarlo v. Potter*, 358 F.3d 408, 419 (6th Cir.2004). If the plaintiff establishes a prima facie case of failure to accommodate, the burden shifts to the employer to demonstrate that the accommodation would impose an undue hardship on the employer. *Id.*, citing *DiCarlo* at 419.

{¶ 91} Thus, to prevail on a failure to accommodate claim, a plaintiff must first demonstrate that they are disabled. *Shaver* at 663. R.C. 4112.01(A)(13) defines the term "disability" as (1) "a physical or mental impairment that substantially limits one or more major life activities, including the functions of caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working;" (2) "a record of a physical or mental impairment;" or (3) "being regarded as having a physical or mental impairment."[9] R.C. 4112.01(A)(13). A "physical or mental impairment" includes "[a]ny mental or psychological disorder, including, but not limited to * * * emotional or mental illness." R.C. 4112.01(A)(16)(a)(ii). This court has found that depression "qualifies as a mental impairment under R.C. 4112.01(A)(16)(ii)." *Shaver* at 666. *See also Cooke v. SGS Tool Co.*, 9th Dist. No. 19675, 200 Ohio App. LEXIS 1784 (Apr. 26, 2000).

{¶ 92} For depression to constitute a disability under R.C. Chapter 4112, the condition must substantially limit one or more major life activities. *See Beauchamp v. CompuServe, Inc.*, 126 Ohio App.3d 17, 23 (10th Dist.1998) (noting that although the "appellant suffered from depression," the appellant had to demonstrate that their

---

[9] A plaintiff may not establish a failure to accommodate claim by relying solely on the "regarded as" definition of disability. *See Wells v. Cincinnati Children's Hosp. Med. Ctr.*, 860 F.Supp.2d 469, 483 (S.D. Ohio 2012), citing 42 U.S.C. 12201(h) (holding that "an employer has no duty to accommodate an employee it regards as disabled"); *West v. United Parcel Serv., Inc.*, W.D. Ky. No. 3:10-CV-716-H, 2011 U.S. Dist. LEXIS 43944 (Apr. 22, 2011), citing *Workman v. Frito-Lay, Inc.*, 165 F.3d 460, 467 (6th Cir.1999) (noting that the "Sixth Circuit has held that employers do not owe a duty to accommodate an employee who is only regarded as having a disability").

depression "substantially limit[ed] one or more major life activities" to constitute a disability under R.C. 4112.01); *Corrado v. Warren-Trumbull County Pub. Library*, 11th Dist. No. 2005-T-0120, 2006-Ohio-4661, ¶ 27, quoting *Cooke* at *14 (holding that absent indication that " 'one or more major life activities have been substantially limit[ed], * * * the experience of depression is insufficient to constitute a disability' "). *See also Woodbridge v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 19AP-321, 2020-Ohio-891, ¶ 23.

{¶ 93} "An impairment 'substantially limits' a major life activity if a person is unable to perform the major life activity, or if a person is significantly restricted in his or her ability to perform the major life activity, as compared to the average person in the general population." *Camp v. Star Leasing Co.*, 10th Dist. No. 11AP-977, 2012-Ohio-3650, ¶ 55, citing *Slane v. MetaMateria Partners, LLC*, 176 Ohio App.3d 459, 2008-Ohio-2426, ¶ 16 (10th Dist.) To determine whether a physical or mental impairment substantially limits a major life activity, courts consider "(1) the nature and severity of the impairment, (2) the duration or expected duration of the impairment, and (3) the permanent or long term impact, or the expected permanent or long term impact of, or resulting from, the impairment." *Jurczak v. J & R Schugel Trucking Co.*, 10th Dist. No. 03AP-451, 2003-Ohio-7039, ¶ 23; *Camp* at ¶ 55, citing *Canady* at ¶ 33. *Compare Shaver* at 666-67 (finding "the severity, nature, duration, and long-term effects" of the plaintiff's depression demonstrated that the condition "substantially limited [the plaintiff] in the major life activity of thinking"); *with Camp* at ¶ 59 (concluding that the plaintiff's depression had not "manifested itself with sufficient frequency or in sufficient duration to qualify as a substantially limiting impairment" because the plaintiff had "only one" depressive episode which lasted four and one-half months and the depression had not "hampered [the plaintiff's] ability to lead an ordinary life" since that episode).

{¶ 94} Although the trial court found that Mr. Childs' depression did not substantially limit Mr. Childs' ability to work, working is only one major life activity that may be impacted by a physical or mental impairment. Regardless, Mr. Childs failed to demonstrate that his depression significantly limited any other major life activity. Although Mr. Childs asserts the July 3, 2017 note from his doctor "provided sufficient information to show impact on life activities," the doctor's note did not identify any major life activities

that were impacted by Mr. Childs' depression. (Appellant's Brief at 47; Childs Dep., Ex. 22.) Mr. Childs averred that after the February 28, 2017 robbery his "symptoms of depression became more severe," as he "had panic attacks, could not hardly sleep and had trouble making it through [his] work days." (Childs Aff. at 3.) However, Mr. Childs explained that his panic attacks did not require him to leave work and that he would simply "go take a breath in the seat and maybe drink some water" during a panic attack. (Childs Dep. at 176.) Mr. Childs stated that he was able to do chores around the house some days, "but not every day," and that it was "not even easy to sleep" some days, although other days he could "sleep all day." (Childs Dep. at 105.) Mr. Childs demonstrated that he took medication to treat his depression. (Childs Aff. of Verity, Ex. G, H, I, & J.)

{¶ 95} Thus, while Mr. Childs indicated that his depression impacted his ability to sleep and do household chores on some days, he did not claim that his depression affected his ability to sleep or do chores for significant amounts of time. Mr. Childs presented no evidence indicating that his depression substantially limited his ability to think or otherwise engage in major life activities, and he affirmed that he could hold a job despite his depression. (Childs Dep. at 105.) Accordingly, Mr. Childs failed to demonstrate that his depression occurred in sufficient duration and with sufficient severity to significantly limit any major life activity.

{¶ 96} As such, Mr. Childs failed to establish that he was disabled. Even if he had, Mr. Childs also could not establish that he was qualified for his assistant store manager position either with or without a reasonable accommodation, because his murder conviction rendered him unqualified for any position of employment with Kroger. *See* Ohio Adm.Code 4112-5-02(K) (defining a "qualified disabled person," as a "disabled person who can safely and substantially perform the essential functions of the job in question, with or without reasonable accommodation, and who is not excluded from the coverage of Chapter 4112 of the Revised Code"); *EEOC v. Ford Motor Co.*, 782 F.3d 753, 766 (6th Cir.2015) (stating that when an employee is "unqualified for her position," it is unnecessary for a court "to consider whether [the employer] showed bad faith in the discussions to work out a reasonable accommodation while [the employee] was still employed").

{¶ 97} Accordingly, Mr. Childs failed to establish a prima facie case of failure to accommodate. As such, the trial court did not err by granting appellees summary judgment on Mr. Childs' disability discrimination claim.

**B. Retaliation**

{¶ 98} R.C. 4112.02(I) provides that it is an unlawful discriminatory practice "[f]or any person to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in [R.C. 4112.02] or because that person has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under sections 4112.01 to 4112.07 of the Revised Code." Retaliation claims based on indirect evidence are evaluated under the *McDonnell Douglas* burden shifting analysis. *Moody*, 2021-Ohio-4578 at ¶ 36, citing *Wu v. Northeast Ohio Med. Univ.*, 10th Dist. No. 18AP-656, 2019-Ohio-2530, ¶ 29.

{¶ 99} To establish a prima facie case of retaliation under R.C. 4112.02(I), a plaintiff must establish that (1) they engaged in protected activity; (2) the defending party knew the plaintiff engaged in protected activity; (3) the defending party took an adverse employment action against the plaintiff; and (4) a causal connection between the protected activity and the adverse action. *Nebozuk v. Abercrombie & Fitch Co.*, 10th Dist. No. 13AP-591, 2014-Ohio-1600, ¶ 40, citing *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 544 (6th Cir.2008). If the plaintiff establishes a prima facie case of retaliation, the burden shifts back to the employer to articulate a legitimate, non-retaliatory reason for its action. *Id.* at ¶ 41, citing *Carney v. Cleveland Hts.-Univ. Hts. City School Dist.*, 143 Ohio App.3d 415, 429 (8th Dist.2001). If the employer carries its burden, the burden shifts back to the employee to establish that the employer's stated reason is a pretext for unlawful retaliation. *Id.*, citing *Carney* at 429. Because of the similarities between R.C. 4112.02(I) and Title VII of the Civil Rights Act of 1964, Ohio courts look to federal case law for assistance in interpreting retaliation claims under R.C. 4112.02(I). *Moody* at ¶ 35, citing *Grubach v. Univ. of Akron*, 10th Dist. No. 19AP-283, 2020-Ohio-3467, ¶ 67.

{¶ 100} The trial court held that Mr. Childs failed to establish a causal connection "between any alleged protected activity" and either the Action Plan or his ultimate termination. (Decision at 5.) Mr. Childs asserts that he "engaged in protected activity with [Ms. Hutchinson] and [Mr. VanReeth], [Ms. Hutchinson] denied accommodation," and

that Mr. VanReeth used the Action Plan "as [an] adverse mechanism to discriminate." (Appellant's Brief at 56-57.)  At his deposition, Mr. Childs claimed his termination "was retaliatory" because he was fired "within weeks" after he informed Kroger of Mr. Gladman's importuning conviction.  (Childs Dep. at 200.)

### 1. Action Plan

{¶ 101}  "An employee's activity is 'protected' for purposes of R.C. 4112.02(I) if the employee has 'opposed any unlawful discriminatory practice' (the 'opposition clause') or 'made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under sections 4112.01 to 4112.07 of the Revised Code' (the 'participation clause')."  *Veal*, 2011-Ohio-5406, ¶ 18, quoting *HLS Bonding v. Ohio Civ. Rights Comm.*, 10th Dist. No. 07AP-1071, 2008-Ohio-4107, ¶ 15.  *Accord Brown v. O'Reilly Auto. Stores, Inc.*, 8th Dist. No. 102694, 2015-Ohio-5146, ¶ 32 (noting that "R.C. 4112.02(I) protects two types of activities: participation and opposition"). To engage in protected "opposition" activity " 'a plaintiff must make an overt stand against suspected illegal discriminatory action.' "  *Jackson v. Champaign Natl. Bank & Trust Co.*, 10th Dist. No. 00AP-170, 2000 Ohio App. LEXIS 4390, *19 (Sept. 26, 2000), quoting *Comiskey v. Auto. Industry Action Group*, 40 F.Supp.2d 877, 898 (E.D. Mich.1999). Vague charges of discrimination are insufficient to satisfy the opposition clause.  *Id.  See also Blizzard v. Marion Technical College*, 698 F.3d 275, 288 (6th Cir.2012); *Weaver v. Ohio State Univ.*, 71 F.Supp.2d 789, 793-94 (S.D. Ohio 1998).

{¶ 102}  To the extent Mr. Childs contends he engaged in protected activity by asking Ms. Hutchinson to transfer him to a different store, his contention fails.  A request for reasonable accommodation does not amount to "participation in any manner in any investigation, proceeding, or hearing" or "opposition to an unlawful discriminatory practice" under R.C. 4112.02(I).  *Musil v. Gerken Materials, Inc.*, 6th Dist. No. L-19-1262, 2020-Ohio-3548, ¶ 20.  *Accord Hall v. Crawford Cty. Job & Family Servs.*, 3d Dist. No. 3-21-19, 2022-Ohio-1358, ¶ 35 (stating that a "request for a reasonable accommodation is not a protected activity under R.C. 4112.02(I)").

{¶ 103}  However, Mr. Childs also asserted that he engaged in protected activity with Mr. VanReeth.  In his affidavit, Mr. Childs stated that he "ask[ed] [Mr. VanReeth] directly that [he] thought [Mr. VanReeth] was treating [him] differently because of [his] race.

Shortly thereafter [Mr. VanReeth] put [him] on a performance improvement plan." (Childs Aff. at 4.) Viewing this statement in a light most favorable to Mr. Childs, as is required in summary judgment proceedings, it demonstrates Mr. Childs directly informed his supervisor that he believed the supervisor was treating him differently than other employees because of his race. As such, this statement creates a genuine issue of material fact regarding whether Mr. Childs engaged in protected opposition activity and whether Mr. VanReeth was aware of Mr. Childs' protected activity. *See Jackson v. Genesee Cty. Rd. Comm.*, 999 F.3d 333, 344-45 (6th Cir.2021), quoting *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 721 (6th Cir.2008) (noting that examples of opposition activity "include 'complaining to anyone (management, unions, other employees, or newspapers) about allegedly unlawful practices' "); *Crawford v. Metro. Govt. of Nashville & Davidson Cty., Tennessee*, 555 U.S. 271, 276 (2009) (internal quotation marks omitted) (emphasis sic) (stating that "[w]hen an employee communicates to her employer a belief that the employer has engaged in * * * a form of employment discrimination, that communication virtually always constitutes the employee's *opposition* to the activity").

{¶ 104} As Mr. Childs has demonstrated a genuine issue of material fact concerning the first two parts of his prima facie case of retaliation, we next consider whether he can satisfy the third—that Kroger took an adverse employment action against him. For a claim of retaliation under R.C. 4112.02(I), an adverse employment action includes any action that "might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Smith v. Superior Prod., LLC*, 10th Dist. No. 13AP-690, 2014-Ohio-1961, ¶ 34, citing *Hughes v. Miller*, 181 Ohio App.3d 440, 2009-Ohio-963, ¶ 28 (8th Dist.). As such, demonstrating an adverse employment action for purposes of a retaliation claim "is less onerous than in the discrimination context." *Arnold v. Columbus*, 515 Fed.Appx. 524, 536-37 (6th Cir.2013), quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006). *See Greer-Burger v. Temesi*, 116 Ohio St.3d 324, 2007-Ohio-6442, ¶ 13, fn.2, citing *Burlington N. & Santa Fe Ry. Co.* (noting that, for purposes of a retaliation claim, "the adverse action need not be employment-related, so the filing of a lawsuit or a counterclaim can constitute an adverse employment action"); *Pettay v. Adtalem Global Educ., Inc.*, 10th Dist. No. 21AP-508, 2022-Ohio-3015, ¶ 10.

{¶ 105} This court has observed that "denial of consideration for promotion, exclusion from meetings, and being singled out for discipline were sufficient to demonstrate adverse employment action for a retaliation claim." *Moody* at ¶ 39, citing *Peterson v. Buckeye Steel Casings*, 133 Ohio App.3d 715, 728 (10th Dist.1999). The Sixth Circuit has observed that a "brief placement on paid administrative leave and [a] 90-day performance plan" met the "relatively low bar" to establish an adverse employment action for a retaliation claim. *Michael*, 496 F.3d 584 at 596. *See also Henry v. Abbott Laboratories*, 651 Fed.Appx. 494, 505 (6th Cir.2016) (finding that a low performance evaluation and a "letter of expectations threatening further action if her performance did not improve" were adverse employment actions for purposes of a retaliation claim); *Arnold* at 537.

{¶ 106} Mr. Childs' Action Plan obligated him to send to Ms. Flury each week a recap of his process walks, a written copy of his store walks, a recap demonstrating that he "ask[ed] 5 department leaders or backups for feedback," and "a detailed copy of his planning sessions." (Childs Dep., Ex. 18.) The Action Plan also required that Mr. Childs have a "sit down meeting every week with [Mr.] VanReeth to discuss his time management." (Childs Dep., Ex. 18.) Mr. Childs informed Ms. Wagenknecht in the June 26, 2017 email that the Action Plan was "pil[ing] more work on [him]." (Childs Dep., Ex. 16.) Although the Action Plan did not reference potential discipline, Mr. Childs stated that during the period of the Action Plan Mr. VanReeth "told [him he] was going to be fired" and that Ms. Flury told him he was "going to lose [his] job." (Childs Dep. at 217; Ex. 16.) Ms. Hutchinson averred that under "Kroger's standard practice," a manager could not be transferred to another store if they had "recently been placed on an Action Plan and not yet demonstrated consistent, improved performance." (Hutchinson Aff. at ¶ 4.)

{¶ 107} Thus, the Action Plan required Mr. Childs to perform additional job duties, required him to have a sit-down meeting with his supervisor each week, prevented him from being transferred to another store, and, Mr. Childs claimed, Mr. VanReeth and Ms. Flury told him he was going to lose his job during the Action Plan. Construing the evidence in a light most favorable to Mr. Childs, placement on the Action Plan might well have dissuaded a reasonable employee from making or supporting a charge of discrimination. *See Smith*, 2014-Ohio-1961 at ¶ 34, citing *Hughes*, 2009-Ohio-963 at ¶ 28. As such, the

Action Plan satisfied the relatively low bar to establish an adverse employment action for a prima facie case of retaliation. *Compare Michael* at 592.

{¶ 108} Therefore, we next consider whether Mr. Childs has demonstrated a genuine issue of material fact concerning the fourth part of a prima facie case of retaliation– a causal connection between protected activity and an adverse employment action. To establish a causal connection, the plaintiff "must produce 'sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not filed a discrimination action.' " *Smith* at ¶ 32, quoting *Gibson v. Shelly Co.*, 314 Fed.Appx. 760 (6th Cir.2008). This court has held that " 'close temporal proximity between the employer's knowledge of the protected activity and the adverse employment action may constitute evidence of a causal connection for purposes of satisfying a prima facie case of retaliation.' " *Moody* at ¶ 41, quoting *Dautartas*, 2012-Ohio-1709 at ¶ 54. *See Moody* at ¶ 41, citing *Hartman*, 2016-Ohio-5208 at ¶ 41 (finding a two-month gap between protected activity and an adverse employment action "sufficient to establish a prima facie case of retaliation"); *Haji v. Columbus City Schools*, 621 Fed.Appx. 309, 313 (6th Cir.2015) (finding a three-month gap sufficient); *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir.2008).

{¶ 109} Although Mr. Childs did not identify the precise time between his statement to Mr. VanReeth and the imposition of the Action Plan, Mr. Childs stated that the Action Plan occurred "[s]hortly" after he made the statement to Mr. VanReeth. (Childs Aff. at 4.) Viewing the evidence in a light most favorable to Mr. Childs, the record presents a genuine issue of material fact regarding the causation element of his prima facie case of retaliation.

{¶ 110} Because Mr. Childs established a genuine issue of material fact as to each step of a prima facie case, the burden shifted to Kroger to offer a legitimate and non-retaliatory reason for Mr. Childs' Action Plan. *See Nebozuk*, 2014-Ohio-1600 at ¶ 40, citing *Imwalle*, 515 F.3d 531 at 544. Kroger stated that it placed Mr. Childs on the Action Plan because Mr. Childs' 2016 year-end performance review rated his performance as consistently delivers expectations low. Ms. Hutchinson averred that "Kroger consistently places management employees on Action Plans and/or Performance Improvement Plans when they demonstrate substandard performance, regardless of race, disability, or

protected activity." (Hutchinson Aff. at ¶ 12.) Accordingly, Kroger satisfied its burden of production.

{¶ 111} As such, the burden shifted back to Mr. Childs to "prove not only that the proffered reason was a pretext, but also that the real reason for the employer's action was unlawful retaliation." *Smith*, 2013-Ohio-4210 at ¶ 76. Mr. Childs failed to carry his burden. Notably, in his responses to Mr. VanReeth's comments on the 2016 performance review, Mr. Childs acknowledged that he "[n]eed[ed] to improve on 100% Execution by more in depth planning ahead and consistency," that his "[c]ommunication ha[d] improved but there [was] still room for progress," and he acknowledged that he failed to meet his established budget requirement. (Childs Dep., Ex. 17.) In his email to Ms. Wagenknecht, Mr. Childs admitted that "[e]verything that went wrong in Merchandising [was] totally [his] fault because it [was his] responsibility." (Childs Dep., Ex. 16.) Thus, Mr. Childs' own statements in the record below acknowledge that his performance needed to improve. Mr. Childs presented no evidence to rebut Ms. Hutchinson's testimony that Kroger consistently placed low-performing management employees on Action Plans. And, Mr. Childs failed to present evidence demonstrating that Kroger's reason for placing him on the Action Plan, *i.e.* his 2016 performance review, had no basis in fact, was not the actual reason for his placement on the Action Plan, or the 2016 performance review was insufficient to explain his placement on the Action Plan. *Hartman* at ¶ 21. Therefore, Mr. Childs failed to demonstrate a genuine issue of material fact regarding whether Kroger's reasons for placing him on the Action Plan were a pretext for unlawful retaliation.

**2. Termination Following Report of Mr. Gladman**

{¶ 112} Mr. Childs also asserts he suffered retaliation because the temporal proximity between his termination and his report of Mr. Gladman's conviction demonstrated that his termination was retaliatory. However, Mr. Childs' report of Mr. Gladman's conviction did not constitute protected activity as opposition to an unlawful discriminatory practice or participation in an investigation, proceeding, or hearing under R.C. 4112.01 to 4112.07. *Compare Motley v. Ohio Civ. Rights Comm.*, 10th Dist. No. 07AP-923, 2008-Ohio-2306, ¶ 15-16 (holding that the "mere assertion of a union grievance, not based upon opposition to discrimination, does not constitute protected activity" for purposes of a retaliation claim); *Ksiazek v. Columbiana Cty. Port Auth.*, 7th Dist. No. 20

CO 0010, 2021-Ohio-1267, ¶ 72-75. Accordingly, because Mr. Childs' report of Mr. Gladman did not amount to protected activity for purposes of R.C. 4112.02(I), Mr. Childs could not establish a prima facie case of retaliation based on that report.

{¶ 113} Based on the foregoing, the trial court did not err by granting appellees summary judgment on Mr. Childs' retaliation claim.

### C. Aiding and Abetting

{¶ 114} Mr. Childs also asserts on appeal the trial court erred by granting Ms. Gray, Ms. Hutchinson, and Mr. VanReeth summary judgment on his claims for aiding and abetting unlawful discrimination. R.C. 4112.02(J) provides that it is an unlawful discriminatory practice for any person "to aid, abet, incite, compel, or coerce the doing of any act declared by this section to be an unlawful discriminatory practice." However, because Mr. Childs failed to establish his claims of race discrimination, disability discrimination, and retaliation, his claims of aiding and abetting unlawful discrimination failed as a matter of law. *See Toth v. Cardinal Health 414 LLC*, S.D.Ohio No. 1:17-cv-00370, 2020 U.S. Dist. LEXIS 45833, *30 (Mar. 17, 2020) (stating that because the plaintiff's "disability discrimination and age discrimination claims fail, his claims of aiding and abetting disability discrimination and age discrimination under Ohio law necessarily fail"); *Lloyd v. Greater Cleveland Regional Transit Auth.*, N.D. Ohio No. 1:18-CV-01557, 2020 U.S. Dist. LEXIS 155826, *42 (Aug. 27, 2020) (stating that "if a plaintiff fails to establish any underlying unlawful discriminatory conduct, his or her aiding and abetting claim also fails"); *Messer v. Summa Health Sys.*, 9th Dist. No. 28470, 2018-Ohio-372, ¶ 67.

{¶ 115} Accordingly, the trial court did not err by granting the individual appellees summary judgment on Mr. Childs' claims for aiding and abetting unlawful discrimination.

### D. Wrongful Termination in Violation of Public Policy

{¶ 116} Mr. Childs also claimed his termination violated the public policy expressed in R.C. 2950.034 because Kroger terminated his employment after he informed Kroger that Mr. Gladman was a sex offender. The trial court found Kroger was entitled to judgment on Mr. Childs' wrongful termination claim as a matter of law. (Decision at 4.)

{¶ 117} In *Greeley v. Miami Valley Maintenance Contrs., Inc.*, 49 Ohio St.3d 228 (1990) the Supreme Court of Ohio first recognized an exception to the employment-at-will doctrine for wrongful discharge in violation of public policy. The court held that "[p]ublic

policy warrants an exception to the employment-at-will doctrine when an employee is discharged or disciplined for a reason which is prohibited by statute." *Id.*, at paragraph one of the syllabus. "The basis of this exception is that when the General Assembly enacts laws that are constitutional, the courts may not contravene the legislature's expression of public policy.' " *Thomson v. Boss Excavating & Grading, Inc.*, 10th Dist. No. 20AP-263, 2021-Ohio-3743, ¶ 9, quoting *Sutton v. Tomco Machining, Inc.*, 129 Ohio St.3d 153, 2011-Ohio-2723, ¶ 8.

{¶ 118} To succeed on a claim for wrongful discharge in violation of public policy, a plaintiff must establish the following elements: (1) that a clear public policy existed and was manifested either in a state or federal constitution, statute or administrative regulation or in the common law ("the clarity element"), (2) that dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy ("the jeopardy element"), (3) that the plaintiff's dismissal was motivated by conduct related to the public policy ("the causation element"), and (4) that the employer lacked an overriding legitimate business justification for the dismissal ("the overriding-justification element"). *Miracle v. Ohio Dept. of Veterans Servs.,* 157 Ohio St.3d 413, 2019-Ohio-3308, ¶ 12, citing *Collins v. Rizkana*, 73 Ohio St.3d 65, 69-70 (1995); *Sutton* at ¶ 9. The clarity and jeopardy elements involve questions of law, while the causation and overriding-justification elements involve questions of fact. *Miracle* at ¶ 12, citing *Collins* at 69-70.

{¶ 119} Mr. Childs alleged his termination violated the public policy expressed in R.C. 2950.034, which prohibits any person who has been convicted of or plead guilty to a sexually oriented offense or a child-victim oriented offense from "establish[ing] a residence or occupy[ing] residential premises within one thousand feet of any school premises, preschool or child-care center premises, children's crisis care facility premises, or residential infant care center." R.C. 2950.034(A). Thus, the statute expresses a clear public policy of prohibiting sexually oriented offenders and child-victim oriented offenders from residing near the listed locations. *See Collins* at 70-71.

{¶ 120} Mr. Childs fails to establish that his termination jeopardized the public policy expressed in R.C. 2950.034 in any way. The evidence demonstrated Kroger terminated Mr. Childs' employment because it discovered Mr. Childs' 1996 murder conviction, not because Mr. Childs reported Mr. Gladman's conviction to Kroger.

Moreover, even if we accepted Mr. Childs' contention that Kroger terminated his employment because he reported Mr. Gladman, Mr. Childs' termination would not have jeopardized the public policy expressed in R.C. 2950.034(A). The statute prohibits sexually oriented offenders from residing in specific locations; it does not prohibit sexually oriented offenders from working at specific locations.

{¶ 121} Accordingly, as Mr. Childs failed to establish the jeopardy element of his wrongful termination in violation of public policy claim, the claim failed as a matter of law. The trial court did not err by granting appellees summary judgment on Mr. Childs' claim for wrongful termination in violation of public policy.

### E. Defamation

{¶ 122} Lastly, Mr. Childs asserts the trial court erred by granting Ms. Gray summary judgment on his claim for defamation. The trial court concluded Mr. Childs had not established that Ms. Gray "published a false and defamatory statement about [Mr. Childs] without privilege or justification." (Decision at 5.)

{¶ 123} "Defamation is defined as 'a false publication that injures a person's reputation.' " *Jahahn v. Wolf*, 10th Dist. No. 12AP-624, 2013-Ohio-2660, ¶ 13, quoting *Gosden v. Louis*, 116 Ohio App.3d 195, 206 (9th Dist.1996). Defamation may occur in two forms: slander, which is spoken; and libel, which is written. *Dehlendorf v. Gahanna*, 10th Dist. No. 14AP-379, 2015-Ohio-3680, ¶ 36, quoting *Crase v. Shasta Beverages, Inc.*, 10th Dist. No. 11AP-519, 2012-Ohio-326, ¶ 46. To establish defamation, the plaintiff must show that (1) a false statement of fact was made, (2) the statement was defamatory, (3) the statement was published, (4) the plaintiff suffered injury as a proximate result of the publication, and (5) the defendant acted with the requisite degree of fault in publishing the statement. *Am. Chem. Soc. v. Leadscope, Inc.*, 133 Ohio St.3d 366, 2012-Ohio-4193, ¶ 77, quoting *Pollock v. Rashid*, 117 Ohio App.3d 361, 368 (1st Dist.1996). "Publication occurs when a defendant communicates a false and defamatory statement to a person or persons other than the person defamed." *Jabr v. Ohio Dept. of Taxation*, 10th Dist. No. 16AP-26, 2016-Ohio-4776, ¶ 8, citing *Hecht v. Levin*, 66 Ohio St.3d 458, 460 (1993). "[T]ruth is a complete defense to a claim for defamation." *Ed Schory & Sons v. Francis*, 75 Ohio St.3d 433, 445 (1996). *Accord* R.C. 2739.02.

{¶ 124} Mr. Childs contends Ms. Gray published a false statement when she told Mr. Shepard that Mr. Childs did not disclose his murder conviction to Kroger. (Appellant's Brief at 53-54.) Mr. Childs contends that Ms. Gray, Ms. Gerace and Ms. Gail gave him "a second chance and waiver because he was a youthful offender when original juvenile act happened so long ago in the past, and policy was Case by Case at the time." (Appellant's Brief at 54.) Thus, Mr. Childs appears to contend that Ms. Gray knew about his murder conviction either at the time he was hired or when he was promoted into management and therefore her statement to Mr. Shepard was false.

{¶ 125} There is nothing in the record to support Mr. Childs' contention that Ms. Gray knew about his murder conviction before May of 2018. The applications and resumes Mr. Childs submitted to Kroger did not disclose his murder conviction. (Childs Dep. at 66, Exs. 1, 3, 12, & 13.) Although Mr. Childs argued that the jobs from GCI and MCI listed on his applications and resumes were "jobs that only a prisoner or inmate [could] have," Mr. Childs acknowledged that he did not state on his applications or resumes that he was actually a prisoner or inmate at GCI or MCI. (Childs Dep. at 57-58.) Ms. Gray explained that Kroger's background checks did not discover Mr. Childs' murder conviction. (Gray Aff. at ¶ 6.) Ms. Gray further explained that, based on her review of Mr. Childs' "management application and the notes from his initial screening interview," she believed Mr. Childs had been "a prison employee, not a prison inmate." (Gray Aff. at ¶ 6.)

{¶ 126} Although Mr. Childs testified that he told Ms. Gerace about his murder conviction, Mr. Childs did not present evidence demonstrating that Ms. Gerace informed Ms. Gray or anyone else at Kroger about his murder conviction. Mr. Childs testified that he told Ms. Gail "[he] got in trouble," but he did not indicate he told her about his prior murder conviction. (Childs Dep. at 138.) Accordingly, because Mr. Childs failed to present evidence demonstrating he disclosed his murder conviction to Kroger, or that Ms. Gray somehow knew about his murder conviction before May of 2018, Mr. Childs failed to establish that Ms. Gray's statement to Mr. Shepard was false.

{¶ 127} Furthermore, " 'a communication made in good faith on a matter of common interest between an employer and an employee, or between two employees concerning a third employee, is protected by qualified privilege.' " *Hatton v. Interim Health Care of Columbus, Inc.*, 10th Dist. No. 06AP-828, 2007-Ohio-1418, ¶ 14, quoting

*Hanly v. Riverside Methodist Hosp.*, 78 Ohio App.3d 73, 81 (10th Dist.1991). "Once the defense of qualified privilege attaches, a plaintiff can only defeat the privilege with clear and convincing evidence that the defendant made the statements at issue with actual malice." *Id.* at ¶ 15, citing *A & B-Abell Elevator Co., Inc. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 73 Ohio St.3d 1, 11 (1995). A defendant acts with actual malice if they make statements with knowledge that the statements are false or if they recklessly disregard the truth or falsity of the statements. *Id.*, citing *A & B-Abell Elevator Co., Inc.* at 11-12. *See Hahn v. Kotten*, 43 Ohio St.2d 237, 244 (1975); *Evely v. Carlon Co., Div. of Indian Head, Inc.*, 4 Ohio St.3d 163, 165 (1983); *Jahahn* at ¶ 17.

**{¶ 128}** Ms. Gray and Mr. Shepard were both managers at Kroger, and their communication regarding Mr. Childs' failure to disclose his murder conviction was a matter of common business interest between them. As such, Ms. Gray's statement to Mr. Shepard was subject to a qualified privilege. Because the evidence demonstrates that Mr. Childs failed to disclose his murder conviction to Kroger, Mr. Childs cannot establish that Ms. Gray made her statement to Mr. Shepard with actual malice. Accordingly, the trial court properly granted Ms. Gray summary judgment on Mr. Childs' defamation claim.

**{¶ 129}** Based on the foregoing, we find the trial court did not err by granting appellees' motion for summary judgment. Mr. Childs' fourth assignment of error is overruled.

## VI. Conclusion

**{¶ 130}** Having overruled Mr. Childs' first, second, third, and fourth assignments of error, the judgment of the Franklin County Court of Common Pleas is affirmed.

*Judgment affirmed.*

JAMISON and BOGGS, JJ., concur.

_____